Filed 12/7/15  Certified for Publication 12/22/15 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RAPHAEL JARED SCALLY,<br><br>    Defendant and Appellant. | G050444<br><br>(Super. Ct. No. 13CF1958)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Michael J. Cassidy, Judge.  Affirmed.

David R. Greifinger, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

The jury found defendant guilty of one count of pimping (Pen. Code, § 266h, subd. (a)) and one count of pandering (Pen. Code, § 266i, subd. (a)). The court held a bench trial and found it to be true that defendant committed the offenses while out on bail. (Pen. Code, § 12022.1, subd. (b).) The court sentenced defendant to the midterm of four years on the pimping count, stayed imposition of the sentence on the pandering count, and imposed, but stayed, a two year on-bail enhancement.

On appeal, defendant raises a single issue: that the court erred by permitting the People's expert to testify that certain text messages sent from defendant to individuals other than the particular prostitute at issue were consistent with pimping activity. Defendant contends this was improper character evidence under Evidence Code section 1101. We conclude the evidence was relevant to rebut the defense that the prostitute was merely defendant's girlfriend — a nonpropensity basis for relevance — and thus we affirm.

FACTS

On June 14, 2013, Santa Ana Police Officer Daniel Padron was assigned to the vice unit and was working undercover in a high prostitution area. Padron observed a Volkswagon traveling on a nearby side street abruptly double park in the middle of the street and let out two women from a rear door. One of the women who got out of the car was AnaMarie S. (AnaMarie), the other was Dakota L. (Dakota), the latter of whom is the subject of the pimping and pandering charge here. There were three males that remained in the car.

Padron followed AnaMarie and attempted to position his vehicle to speak with her, but she passed his vehicle and spoke with the driver of a truck; she entered the truck and it drove away. The truck was subsequently stopped. Padron spoke with the male driver and AnaMarie and found $50 on the armrest between them. The driver of the

2

truck testified that he had agreed to pay AnaMarie $50 for a sex act, but that the police had stopped his truck before she performed the act.

Approximately 45 minutes after initially seeing the Volkswagon drop off the women, Padron spotted it again and made contact with the occupants. Defendant was in the rear passenger seat. Padron found $194 in defendant's right sock. Padron asked defendant if he had a job, defendant said he did not. Padron asked defendant where he got the money; defendant replied he did not know.

Padron obtained defendant's phone, which was continuously ringing. Text messages were being sent to defendant's phone from a number identified as "Sweetie," which Padron read. Padron responded to the text messages, first asking where she was and ultimately arranging to meet her. Dakota was waiting at the meeting location. Padron recognized Dakota from an earlier prostitution investigation in which Padron had responded to her online advertisement Dakota had agreed to exchange money for a sex act. Dakota had a phone on her that contained text messages corresponding to the messages on defendant's phone from "Sweetie." Dakota did not have any money on her.

The police extracted many text messages from defendant's phone, which were admitted into evidence (and which are discussed in connection with the People's expert's testimony, below). The police also found photographs of Dakota on defendant's phone that corresponded to the photographs Padron had discovered in the online prostitution advertisement in his previous investigation of Dakota

The People called Officer Luis Barragan as an expert in the field of pimping, pandering, and prostitution. Barragan testified that a tattoo on AnaMarie's thigh is indicative of a pimp-prostitute relationship. The tattoo depicts a crown on top of the letter P, which is next to the letter D and has dollar signs floating around the letters. Barragan testified that tattoos of a crown and a dollar sign are common symbols of a pimp. He also testified the term "pimp daddy" is a common term used by prostitutes to describe a pimp. Barragan offered similar opinions about other tattoos on AnaMarie.

3

Barragan testified that a tattoo on Dakota's thigh of a flower with a dollar sign in the middle, underneath which appears the word "Stage," is indicative of a pimp-prostitute relationship, focusing, again, on the dollar sign. "Stage" is defendant's moniker.

Barragan also testified about the numerous text messages extracted from defendant's phone. In one exchange between defendant and Dakota, which took place on June 7, 2013 (one week before the arrest), defendant stated, "Bitch I'm good on u don't say shit to me go worry about getting high instead of getting money,"[1] "U dumb bitch," "I'm sick of u & ur games but its coo watch ima show yo ass," "U a weak ass bitch." Dakota: "Your just realy being over the top." Defendant: "I'm done," "Do u I'm on my own hustle," "I'ma make my own $ my way," "I'm tired of going through this wit u," "U making me look super bad rt now smh [shaking my head] its all good though," "I got u." Defendant continued: "U was so down to walk to get a swisher to get fuckin high but u don't wanna walk the blade make no money SMH bitch u weak." (The term "blade" refers to an area where a prostitute attempts to solicit business.) "U gonna see tho watch! U think shit is a game." Dakota: "Ok idk why your saying wen I'm going out your just realy being mean." Defendant: "Don't text me." "Don't talk to me." "All u worried about is getting high I'm cool on you foreal." Dakota: "You alwaz say shit win your mad n u know I'm about my money idk why your saying this shit know," "I do everything in my power to keep u happy but tht doesn't seem to work." Defendant: "Get off my line." "I'm done." "Do u?" Dakota: "Wht do u mean by tht?" "Forreal." "Stop saying tht." Defendant: "Goodnight." Dakota: "No talk to me for real." "Plzzzz." "Ok stage I got the messige I will leave you alone ok I will just try my best to get money shit you ack like I waz talk to other nigga n shit but ok I got the messige." A few hours later

---

[1] All text messages are repeated in their original form, including grammatical errors.

defendant texted, "U good?"  Dakota replied, "Yea."  Defendant responded, "Ok," "U good."

Barragan opined this exchange is consistent with a pimp-prostitute relationship because "it shows a pattern of psychological control."  "Because it shows him verbally putting her . . . down and telling her, in essence, she is not good for him."  "And he continues to put her down, where eventually he brings her back up."  Barragan also noted that some of the terminology in the exchange, such as "walk the blade," is consistent with a pimp-prostitute relationship.

Barragan also opined that the following exchange was consistent with a pimp-prostitute relationship:  Dakota:  "There's 2 pips out."  Defendant:  "U good?"  Dakota:  "Yea."  Defendant:  "Wya [where you at]?"  Dakota:  "Going back to the street."  Defendant:  "Ok."  "After yo date get in the car."  "We done."  Barragan explained that a "date" in the pimping culture refers to an agreed upon sex act with a client.  Barragan further explained, "He's supervising her and continuously asking her if she's okay, or where her location is at, and also, giving her directions or orders."

Barragan also opined the following conversation between defendant and Dakota was indicative of a pimp-prostitute relationship:  Defendant:  "U good?"  Dakota:  "Yeah the cops just left tht street thoo my trick getting ciggs nd he pay star to come along but she didn't have to do anything I have 120."  Defendant:  "Ok."  "Are you still working?  Just get 250 & we can leave."  Approximately 30 minutes later, defendant:  "Go somewhere so we can pick yall up."  "Wya?"  "Get off camile."  A "trick" is another name for a john, or a client.  Barragan opined that this "appears a conversation is being had between a pimp and a prostitute out on the track."  Barragan explained that a prostitute usually has a quota to meet each night on the street, and opined that the numbers referred to are dollar amounts.

Another exchange Barragan testified was consistent with a pimp-prostitute relationship was the following:  Defendant:  "U good?"  Dakota:  "Yea."  Defendant:  "Ok I see u getting it we been up & down the blade."  Dakota:  "Yea I have 130."  "I'm trying."  Defendant:  "Ok keep working."

The final exchange between defendant and Dakota occurred the night of the arrest.  Defendant:  "U good?"  "We parked on Camille."  Dakota:  "Ok yea getting drop back off."  "Be careful some times the cops shine the lights in the cars."  "Just saw you pass."  Defendant:  "We on shannon."   Dakota:  "Gang of hoes out here n pimps."  Defendant:  "ok ima pull over there."  "U good?"  "U see me showin out on the blade?  Lol."  Dakota:  "Yeah lol I have 140 and on a date right know for 60 the black girls are mad lol."  Defendant:  "Get 300 & come in."  "U already got 200."  "Just get another 100."  Dakota:  "Got one for 80."  Defendant:  "After that go to Shannon."  Dakota:  "I'm done."  Defendant:  "Where u at?"  Dakota:  "On shannon."  Defendant:  "On my way u did good luv."  Dakota:  "Thank u daddy."  "I had to do good today."  Defendant:  "Hella cops out here."

Barragan opined that this conversation is consistent with a prostitute indicating she had been dropped off after a date and updating her pimp on the amount she had made, and the pimp giving her instructions on how much more to make prostituting.  Barragan explained that Camille is a street near the main track where prostitutes are typically dropped off.  Shannon is also a street near the main track where prostitutes are frequently dropped off to avoid police detection.  And in connection with Dakota's comment that the black girls were mad, Barragan explained that white females tend to make more money than prostitutes of other races.

Barragan also testified about various text messages not involving Dakota, which is the evidence defendant claims was erroneously admitted.  In one message to someone identified as "Ray," defendant bragged, "Man my bitch had a 500 $ date yesterday," "And a 1k date today," "And she got another 1k date for Friday," "I'm maxxx

6

up rt now bro," "I'm doing really good rt now." Barragan testified that this is consistent with pimping culture because pimps tend to brag about the money their prostitutes are making on the job.

In another exchange with "Ray," Ray stated, "U gone b good pimp." Later in that exchange, defendant stated, "Man guess who on my line lol," "Jasmine Bell," "Its Choose'n season lmao," "Niggaz better cuff they bitch lmao," "She outta pocket talkin to me." Barragan explained that "out of pocket" could mean a prostitute is looking to leave her current pimp for a new pimp. In a text exchange with "Jazmine Bell," defendant stated "I'm to focused on getting $$$," "I need a girl who hustle like me," "A lot of girls I kno are lazy & to much drama." Barragan opined this was consistent with pimping.

In another exchange with Jazmine Bell, defendant stated, "What's good with u Jasmine, this Stage." When asked what he has been up to, defendant responded, "Shit just grindin tranna get this $$$ . . . ." Defendant identifying himself as "Stage" is consistent with the tattoo Dakota had on her leg depicting the word "Stage." Barragan also testified the term "grinding" refers to prostitution activity in the pimping culture.

In an exchange with someone identified as "moe," defendant commented he was "wit 2 bad hoes," "They about to work the blade."

In an exchange with someone identified as "dakeis," defendant is asked, "U comin out tonight?" When defendant responded "Probably," dakeis texted "smh," after which defendant explained, "Idk [I don't know] yet she might have an overnight date tonight." Barragan explained that in the pimp culture an overnight date is when a client is willing to pay for a prostitute's service for the entire night.

7

In an exchange with someone labeled "twin," defendant commented he was "Makin sum $$$," "I went to harbor last night," "It was weak smh." Barragan interpreted this as a reference to the popular area around Harbor Boulevard where prostitutes ply their trade.

Finally, Barragan was asked about the following hypothetical: "Let's assume we have Jane Doe 1. She gets out of a car. A guy named Dave is in the car, let's call him Dave. Okay. Jane Doe 1 gets out of the car with a guy named Dave in an area known for prostitution, high prostitution area. She's got Dave's nickname tattooed on her, that tattoo is a dollar symbol. She only calls Dave by daddy or his nickname. She's given an amount by Dave to make while working the blade. [¶] She tells Dave that she's on a date for 60 after making 140. And she's given a quota to get $300 and stop working." Barragan opined this was a pimp-prostitute relationship: "there's multiple indicators. She's being dropped off in a prostitution track. She's got the tattoo. She's receiving phone calls. She's being directed how much money to make. She's telling Dave how much money she's made. He's telling her how much more money to make before coming back to him. And they are using words such as . . . 'date' and 'blade.' [¶] Based on the totality of that hypothetical and factoring in all those indicators, coupled with my expertise in the subject, I would have to say that yes, it's a pimp/prostitute relationship."

Before argument the court dismissed the counts of pimping and pandering as to AnaMarie pursuant to Penal Code section 1118.1. Thus the sole charges remaining were pimping and pandering as to Dakota.

In closing argument, defense counsel argued defendant's relationship with Dakota was merely a boyfriend/girlfriend relationship: "Mr. Scally had a girlfriend who was a prostitute." "It's not a crime." "She did not support Mr. Scally in whole or in part."

8

DISCUSSION

Defendant's sole contention on appeal is that the admission of text messages pertaining to pimping activity not involving Dakota, and Barragan's testimony about the same (the "disputed evidence"), was improper character evidence under Evidence Code section 1101, subdivision (a). Defendant contends the disputed evidence was inadmissible because it "effectively gutted the defense that appellant's interactions with Dakota were between a boyfriend and girlfriend." In our view, however, that is precisely why the disputed evidence was admissible.

Penal Code section 266h, subdivision (a), defines pimping as follows: "Except as provided in subdivision (b), any person who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution, . . . is guilty of pimping, a felony, and shall be punishable by imprisonment in the state prison for three, four, or six years." To prove this count, the People had to prove defendant knew Dakota was a prostitute and that the money Dakota earned as a prostitute supported defendant, in whole or in part. (CALCRIM No. 1150.)

The issue is whether the court admitted prejudicial evidence in violation of Evidence Code section 1101, subdivision (a), which states, "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Subdivision (b) provides several exceptions: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident, . . .) other than his or her disposition to commit such an act."

9

The texts between defendant and others were relevant on the issue of intent. Defendant's argument at trial was, essentially, that defendant was an innocent bystander, a helpful boyfriend who took no part in Dakota's independent prostitution activity. Defendant's counsel described Dakota as "an independent woman," and called her "a business woman." Defense counsel argued there was nothing illegal about having a prostitute as a girlfriend. To accept this theory the jury would have to conclude that defendant was merely holding Dakota's money for her, and his various instructions to her were simply disinterested encouragement for her to earn more. As implausible as that theory seems, the prosecution was entitled to rebut it by showing that defendant is steeped in the pimping culture, thus undermining the claim that defendant was merely an innocent bystander. And that is precisely what the texts with third parties did. They showed him using pimp terminology, bragging about the money he was making, recruiting, exhibiting knowledge of high prostitution areas, and scheduling his work around prostitution dates. This evidence informed the jury that when defendant apparently acted as Dakota's pimp on June 14, 2013, he was not a victim of his own ignorance, but was deliberately acting the part of the pimp.

Even if we assume the court erred in admitting the disputed evidence (which it did not), the error was harmless. The record overwhelmingly supports the conviction for this charge. In closing argument, defendant's counsel acknowledged that defendant knew Dakota was a prostitute: "I'm not here to argue that [defendant] didn't know what she was doing out there." And there was circumstantial evidence that he derived support from Dakota the night of the arrest. In her text messages to him shortly before the arrest, she claimed to have made $200. When defendant was arrested, he had approximately $200 ($194) stuffed into his sock, and he had no explanation for how he got it. Dakota had no money on her when she was apprehended. A jury could reasonably conclude defendant had derived the $200 from Dakota's prostitution activities.

10

Moreover, a jury could conclude that, as a matter of common sense, when defendant was instructing Dakota to meet certain quotas, he was doing so for his own gain.

With regard to the pandering charge, Penal Code section 266i, subdivision (a)(2), defines pandering as anyone who "[b]y promises, threats, violence, or by any device or scheme, causes, induces, persuades, or encourages another person to become a prostitute." Our high court has held that this applies to existing prostitutes as well: "The language of the pandering statute describes current conduct on the part of the defendant: inducing and encouraging. That current conduct is aimed at producing subsequent conduct by the target: that the target thereafter engage in acts of prostitution following a defendant's inducement or encouragement." (*People v. Zambia* (2011) 51 Cal.4th 965, 975.) "[W]e conclude that the proscribed activity of encouraging someone 'to become a prostitute,' as set forth in section 266i, subdivision (a)(2), includes encouragement of someone who is already an active prostitute, or undercover police officer." (*Id.* at p. 981.)

Here again, even if we assume the court erred in admitting the disputed evidence (which it did not), the error was harmless. The record overwhelmingly supports the pandering charge. One week before the arrest, when Dakota apparently was not working enough as a prostitute for defendant's liking, defendant berated her and made veiled threats: "ima show yo ass." "U gonna see tho watch! U think shit is a game." The threats had their intended effect, with Dakota ultimately capitulating: "Ok stage I got the messige I will leave you alone ok I will just try my best to get money . . . ." On the night of the arrest defendant was instructing Dakota to continue prostituting until she had made a certain quota. He was thus encouraging her by the force of his threats and psychological manipulation to continue prostituting.

11

DISPOSITION

The judgment is affirmed.


IKOLA, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ARONSON, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G050444 |
| v. | (Super. Ct. No. 13CF1958) |
| RAPHAEL JARED SCALLY, | O R D E R |
| Defendant and Appellant. | |

The Orange County District Attorney has requested that our opinion filed on December 7, 2015, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.

The opinion is ordered published in the Official Reports.


IKOLA, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ARONSON, J.