Filed 9/24/20  P. v. Ford CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

|  |  |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DESTIN FORD,<br><br>    Defendant and Appellant. | B300811<br><br>(Los Angeles County<br>Super. Ct. No. BA468311) |

APPEAL from an order of the Superior Court of Los Angeles County, Norman Shapiro, Judge.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Gary A. Lieberman, Deputy Attorney General, for Plaintiff and Respondent.

Over a period of several weeks, a young woman named Raelynn D. (Raelynn) worked as a prostitute and gave all the money she earned to defendant Destin Ford (defendant). We are asked to decide (1) whether substantial evidence supports defendant's conviction for pimping (he claims he did not profit from Raelynn's prostitution and the two were engaged in a "quasi-familial" relationship) and (2) if so, whether the pimping statute violates substantive due process guarantees as applied to him.

## I. BACKGROUND

Raelynn was 22 years old when she testified at defendant's trial in 2019. She said she did not want to testify and only came to court because she did not want to go to jail. The following summary of Raelynn's testimony about the offense conduct incorporates statements she made in a Los Angeles Police Department (LAPD) interview, excerpts of which were admitted into evidence.

Raelynn grew up in California, worked as a prostitute off and on for a few years, and then moved to Ohio. When she returned to California in March or April 2018, she had no permanent place to stay. She contacted a friend, "LaLah,"[1] who is the mother of a child fathered by defendant.

Raelynn stayed with defendant and LaLah at various locations over the next several weeks, including Bakersfield, Las Vegas, and a room defendant and LaLah rented in Lancaster. She was not sure who paid the rent. Raelynn worked as a prostitute all but one or two nights during her stay with

---

[1]  The appellate record and briefs include several variant spellings of LaLah's name. We use the spelling that appears most frequently in the reporter's transcript.

defendant and LaLah.[2] Raelynn recalled describing defendant as her pimp to police and acknowledged that she called defendant "daddy" in messages sent via Facebook.[3] She testified she saw him as a friend who would protect her.

Raelynn gave defendant all the money she earned during the time she was living with defendant—roughly $800. Raelynn claimed defendant "wouldn't keep [her] money, he just held it for [her]. All [her] money went towards [her] children." Raelynn was with defendant all day, every day and did not believe he had a job. Defendant slept in the same rooms as Raelynn. He bought food for her in cash and, most of the time, also bought food for himself. Defendant arranged for Raelynn's children to stay with one of his friends, a woman named Pam, and Raelynn saw the children at night when she was done working.

Raelynn testified defendant did not tell her what prices to charge for sex. She previously told police, however, that defendant instructed her to charge $60 for a "quick session," $100 for 30 minutes, $140 for 45 minutes, and $180 for an hour. Raelynn also acknowledged that during their time in Las Vegas, defendant sent her messages via Facebook instructing her to solicit a specific man and to charge him $80 for 10 minutes. Defendant led Raelynn through the ensuing negotiations, first telling her not to lower her rates when the potential customer said he could not afford $80 and subsequently telling her $60 was acceptable. He sent messages telling her, in effect, that she

[2] The precise length of Raelynn's stay with defendant and LaLah was not clear: she testified she was with defendant and LaLah from the end of March through April of 2018, but she also stated she "worked" for defendant for about two to three weeks.

[3] Raelynn acknowledged "daddy" is "usually what a female calls a guy she is working with." By "female," she meant a commercial sex worker; by "guy she is working with," she meant a pimp.

3

needed to bring in a "good trap," essentially "a good amount of money," each night. Later, back in California, defendant sent Raelynn a message telling her she needed to get at least $80 from every customer. Raelynn sometimes sent defendant photographs of cash so he would not think she was lying about the amounts she earned.

Apart from telling her not to go too far from where he dropped her off to work, Raelynn testified she did not recall any other rules defendant set for her. Instead, he encouraged her to "keep doing what [she] was doing." Raelynn acknowledged, however, that defendant sent her messages telling her to walk a bit faster, to put on or take off her sweater, and to change her hair. While in Las Vegas, he told her to take a photo of each casino she entered and asked if she had condoms. When she said she did not know whether she had condoms, defendant told her to "make a tric [sic]" and he would give her some.

Defendant applied both persuasion and force to keep Raelynn working for him. When she told him she wanted to stop, he reminded her of "all the things that [she] told him [she] wanted to do," things that cost money. At one point, after Raelynn briefly left defendant and LaLah, defendant saw her in a Palmdale WalMart and grabbed her arm. (Raelynn told police defendant grabbed her by the hair.) Defendant escorted her to his car and she then resumed working for him. Raelynn testified she did not want to go with defendant, "but at the same time . . . [she] wanted to" because she had no money.

Raelynn finally stopped working for defendant on April 27, 2018. That evening, LAPD vice officer Jose Leon was working undercover along the Sepulveda Corridor, an area frequented by prostitutes. He observed Raelynn monitoring traffic and walking without purpose; he made eye-contact with her, pulled over, and waited for her to approach his car. When Raelynn offered to perform different sex acts for different dollar amounts, Officer Leon's team took her into custody and then released her at the

4

scene. Raelynn called defendant to pick her up because she would go to jail if she continued working in the area. Defendant refused because Raelynn had not made any money. He told her to continue working the back streets.

Raelynn called her mother to pick her up. Raelynn's mother told her she would not do so unless she told the police about her situation. Raelynn agreed, and she and her mother went to a police station in Van Nuys the same night. There, Raelynn was interviewed by officers assigned to LAPD's human trafficking unit. Officer Leon picked up Raelynn's children from Pam's home in Palmdale.

Aaron Korth, one of the LAPD officers who interviewed Raelynn, testified about the circumstances of the interview and opined as an expert about the commercial sex trade generally. He also testified about evidence recovered from Raelynn's phone, including text messages and messages sent via Facebook. In addition to the messages we have already discussed, Officer Korth found text messages from defendant telling Raelynn to stay in pocket (i.e., not to disrespect him while she was working) and to keep walking (i.e., to not stand still when trying to solicit customers). Officer Korth identified defendant based on his Facebook account, which Raelynn showed them.

At trial, a jury found defendant guilty of the sole count charged against him: pimping in violation of Penal Code section 266h, subdivision (a).[4] Defendant admitted a prior conviction for robbery. The total sentence imposed was six years in state prison: the low term of three years, doubled on account of the prior "strike" conviction. (§§ 667(b)-(i), 1170.12.)

---

[4]    Undesignated statutory references that follow are to the Penal Code.

## II. DISCUSSION

Sufficient evidence supports defendant's pimping conviction. He argues he did not derive support or maintenance from Raelynn's prostitution, as required to establish a violation of the pimping statute, because the money he spent on her room, board, and childcare must have exceeded the $800 she gave him. But there is substantial evidence defendant supported himself at least partly from Raelynn's prostitution money, even if he also spent some of that money on her. Defendant's substantive due process challenge to the pimping statute fails because the statute infringes on no fundamental right and is rationally related to the goal of suppressing prostitution.

### A. *Substantial Evidence Supports Defendant's Conviction*

Under section 266h, subdivision (a), "any person who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution, or from money loaned or advanced to or charged against that person by any keeper or manager or inmate of a house or other place where prostitution is practiced or allowed, or who solicits or receives compensation for soliciting for the person, is guilty of pimping, a felony . . . ." (§ 266h, subd. (a).) "Thus, section 266h can be violated in either of two basic ways: (1) by *deriving support* from the earnings of another's act of prostitution or (2) by *soliciting*." (*People v. McNulty* (1988) 202 Cal.App.3d 624, 630 (*McNulty*).)

In this case, the jury was instructed on only the first theory: defendant deriving support from the proceeds of Raelynn's prostitution. "[D]eriving support with knowledge that the other person is a prostitute is all that is required for violating the section in this manner. No specific intent is required. [Citation.]" (*McNulty, supra,* 202 Cal.App.3d at 630.)

6

"'In order to establish that the accused lived and derived support and maintenance from the earnings of prostitution it is not necessary for the prosecution to prove that the money was expended for that purpose. [Citation.] It is not a defense that the accused had a sufficient income from other sources .......' [Citation.]" (*People v. Jackson* (1980) 114 Cal.App.3d 207, 210 (*Jackson*).) It is also no defense that the proceeds from another person's prostitution were used to pay shared expenses. (*People v. Navarro* (1922) 60 Cal.App. 180, 182 ["It was shown that, during the period of their cohabitation, the [defendant] paid the room rent and purchased some meals for the prosecutrix and himself. It was not necessary to show that the money he received from her was used solely to pay his own living expenses"]; see also *People v. Scally* (2015) 243 Cal.App.4th 285, 293 [when there is evidence a defendant "was instructing" another individual to "meet certain quotas" working as a prostitute, a jury may conclude, "as a matter of common sense," that "he was doing so for his own gain"].)

Here, the jury could reasonably infer that when defendant told Raelynn what prices to charge, identified potential customers, advised her on how to look and act when soliciting customers, and insisted that she bring home a good amount of money—to the point that Raelynn felt the need to send him photographs of cash—he was doing so for his own gain. In addition, notwithstanding Raelynn's testimony that "all" her money was spent on her children, the jury could reasonably conclude that the rooms defendant shared with Raelynn and his use of apparently commingled cash to purchase meals for himself demonstrate that he derived at least some portion of his subsistence expenses from her earnings. Further, even if defendant did not realize a profit on any particular day, substantial evidence supports the jury's conclusion that defendant's spending on Raelynn was a criminal investment in expected or hoped for future profits. (See, e.g., *People v. Tipton*

7

(1954) 124 Cal.App.2d 213, 215-218 [affirming conviction under earlier version of pimping statute where a young woman earning "from $30 to $60 per day" working as a prostitute was furnished with "heroin each day that would otherwise have cost her $50" because "furnishing of the heroin had the purpose, intent and effect of inducing [the woman] to engage in prostitution in order that [the defendant] could make a profit therefrom"].)

Defendant nevertheless characterizes the money given to him by Raelynn as reimbursement for household expenses, but that ignores her testimony emphasizing the commercial nature of their relationship. Although Raelynn testified that she considered defendant a friend, she also said that she worked for him, described him as her pimp, and called him "daddy." The fact that Raelynn gave defendant *all* of her earnings, without demanding or expecting any accounting of how he spent it, forecloses any analogy to scenarios in which proceeds from prostitution are used to pay for discrete services rendered (see, e.g., *Allen v. Stratton* (C.D.Cal. 2006) 428 F.Supp.2d 1064, 1072, fn. 7 ["even if paid with proceeds earned from prostitution, [a] psychologist derives his support from his own performance of services, and not directly from the prostitute's earnings"]) or offered as a loan (see, e.g., *People v. Reitzke* (1913) 21 Cal.App. 740, 742). In short, there was substantial evidence that, whether or not he ultimately realized a profit, the proceeds from Raelynn's prostitution went toward defendant's support and maintenance.[5]

**B. Section 266h Is Constitutional as Applied**

Separate from his sufficiency of the evidence argument, defendant also contends his pimping conviction violates the

---

[5] Indeed, if the contrary were true, it is hard to fathom why defendant refused to pick up Raelynn after she was arrested and released for the reason he gave her, namely, because she had not made any money from prostitution that day.

Fourteenth Amendment's guarantee of substantive due process. "In addressing a substantive due process argument, we first identify the liberty interest asserted and then determine whether it is a 'fundamental right[ ] and libert[y that is] objectively, "deeply rooted in this Nation's history and tradition" .......' ([*Washington v. Glucksberg* (1997) 521 U.S. 702,] 720-721, 117 S.Ct. 2258 [(*Glucksberg*)].)" (*In re H.K.* (2013) 217 Cal.App.4th 1422, 1432.) If the challenged statute implicates a fundamental right, it is subject to strict scrutiny review. (*Id.* at 1433.) If, on the other hand, the "statute does not implicate a fundamental right or operate to the singular disadvantage of a suspect class, only a rational relationship to a legitimate state purpose is necessary to uphold the constitutional validity of the legislation. [Citations.]" (*Ibid.*; accord *In re Taylor* (2015) 60 Cal.4th 1019, 1036.)

Defendant contends application of the pimping statute in this case intrudes upon his "fundamental rights to create and maintain intimate relationships, his right to privacy, [and] his right to liberty." In more concrete terms, defendant contends he has a fundamental right to enter into a "quasi-familial" relationship with a person working as a prostitute and to pay shared expenses with her earnings.

Most aspects of defendant's domestic arrangements are irrelevant to his conviction under section 266h, subdivision (a). The statute does not prohibit defendant's cohabitation with Raelynn. It does not even prohibit him from collecting her share of household expenses. It only prohibits him from knowingly deriving his own support from the proceeds of Raelynn's prostitution. "[U]nlike the United States Supreme Court's recognition of certain fundamental liberties in *Lawrence* [*v. Texas* (2003) 539 U.S. 558,] 575-577, 123 S.Ct. 2472[,] *Eisenstadt* [*v. Baird* (1972) 405 U.S. 438,] 440, 453, 458, 92 S.Ct. 1029, and *Meyer* [*v. Nebraska* (1923) 262 U.S. 390,] 399, 43 S.Ct. 625, with which we have no quarrel, we are here concerned with a

9

prohibition related to commercial sexual conduct." (*People v. Grant* (2011) 195 Cal.App.4th 107, 113 [rejecting facial challenge to section 266h, subdivision (a)] (*Grant*).) The commercial dimension of defendant's relationship with Raelynn has no place in the lineage of cases "interpreting the Due Process Clause to protect certain fundamental rights and 'personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education' . . . ."[6] (*Glucksberg*, *supra*, 521 U.S. at 726, quoting *Planned Parenthood of Southeastern Pa. v. Casey* (1992) 505 U.S. 833, 851.)

"In the absence of a fundamental liberty interest, we review the constitutionality of the challenged portion of [the pimping statute] to determine whether it bears some rational relationship to a valid state interest." (*Grant*, *supra*, 195 Cal.App.4th at 113-114.) Section 266h, subdivision (a) "discourage[s] prostitution by discouraging persons other than the prostitute from augmenting and expanding a prostitute's operation, or increasing the supply of available prostitutes. [Citations.]" (*People v. Hashimoto* (1976) 54 Cal.App.3d 862, 867.) As the Court of Appeal explained in *Grant*, suppressing prostitution is a proper legislative goal and the "prohibition against deriving support from the earnings of a

[6] Defendant suggests the rationale for applying the pimping statute in this case would apply with equal force to dependent adults living with people who work as prostitutes, anyone whose roommate pays his or her share of the rent with proceeds from prostitution, and landlords of people working as prostitutes. Even if defendant's argument did not ignore material differences between this case and the hypothetical cases (e.g., defendant is not a dependent of Raelynn, the money she gave him was not limited to her share of expenses, and he was not her landlord), it has no relevance to his as-applied challenge. As we have already mentioned, and as defendant acknowledges, the Court of Appeal rejected a facial challenge to section 266h, subdivision (a) in *Grant*, *supra*, 195 Cal.App.4th 107 at 113. Defendant does not argue *Grant* was incorrectly decided, and rightly so.

known prostitute" is "neither novel nor unprecedented as the same or essentially similar language has been validated as a necessary means to suppress prostitution by legislatures and decisions of the courts in other states. [Citations.]" (*Grant, supra*, at 117.)

Defendant suggests the statute is not rationally related to suppressing prostitution because its "Dickensian" approach criminalizes the provision of necessities such as food and shelter to those working as prostitutes. Even if such conduct were prohibited under section 266h, subdivision (a)—and it is not[7]—defendant's conviction does not rest on his providing food and shelter to Raelynn. It rests, rather, on his collecting all proceeds from Raelynn's prostitution while setting the prices she charged, advising her on soliciting customers, and using at least some of the money she made to support himself. Enforcement of the pimping statute under these circumstances is rationally related to suppressing prostitution.

_____

[7]     Defendant's construction of the pimping state is based on the Court of Appeal's quotation, in *Grant*, of a 1942 opinion by the Supreme Court of Arizona observing that "'[i]f a prostitute knows that no one in the state will accept any of her earnings, even for food and shelter, she is certainly much less likely to ply her trade within the state, and indeed, if all citizens obey the law, would be compelled either to cease her profession or remove to some other locality.'" (*Grant, supra*, 195 Cal.App.4th at 116, quoting *State v. Green* (1942) 60 Ariz. 63, 66 [ ].) *Grant*, however, expressly held that section 266h, subdivision (a) "does not preclude a person from accepting a known prostitute's funds gained from the prostitute's lawful activities or for purposes other than the person's support and maintenance." (*Ibid.*) *Grant* cites the Arizona opinion only to illustrate that, even if section 266h, subdivision (a) could be construed more broadly, it would still be rationally related to a proper legislative goal.  (*Ibid.*)

11

DISPOSITION

The judgment is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, J.

We concur:



RUBIN, P. J.



KIM, J.