Filed 10/19/22  P. v. Johnson CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>LESHONE DEWUAN JOHNSON,<br><br>        Defendant and Appellant. | A158288<br><br>(Solano County<br>Super. Ct. No. FCR333521) |

A jury convicted Leshone Dewuan Johnson of trafficking a minor for a commercial sex act (Pen. Code,[1] § 236.1, subd. (c)(1) [count one]), pimping a minor over the age of 16 (§ 266h, subd. (b) [count two]]); pandering a minor over the age of 16 (§ 266i, subd. (b)(1) [count three]; oral copulation of a person under the age of 18 (§ 288a, subd. (b)(1)) [count four]; and unlawful sexual intercourse (§ 261.5, subd. (c) [count five]). The trial court sentenced him to 13 years four months in prison.

On appeal, Johnson contends that his pimping conviction should be reversed because there is insufficient evidence that the minor, T.B., earned money from prostitution or that she gave him any money she earned from prostitution. He further argues, and the Attorney General agrees, the matter

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

must be remanded for resentencing in light of recent amendments to section 1170. We conclude that sufficient evidence supports Johnson's pimping conviction, but agree with the parties that the case should be remanded for resentencing.

## FACTS

T.B. was 18 years old when she testified at Johnson's trial in 2019.[2] T.B. left home when she was 13 years old and turned to prostitution as a means to support herself. She testified that in prostitution parlance, going on a "date" meant "go[ing] to the guy that you're getting money from." To get dates, she advertised herself on Backpage, which included "in-calls" (men went to her location) and "out-calls" (she went to location of the men). T.B. did not enjoy the dates themselves, but enjoyed the money she earned from them. Although she would have rather earned money a different way, prostitution was the only way she knew how to make money. She described a "pimp" as being someone who told her "where to go, when to go" and maintained some control over the money she earned from prostitution.

T.B. met Johnson sometime in 2016 after she had stolen a car and was on the run from the police. Although she was 16 years old, she told Johnson she was 21. T.B. stayed with Johnson for a few weeks. During this time, they had a sexual relationship and she never left the house. Eventually, T.B. left Johnson's house; she could not remember where she went but believed she went to juvenile hall.

T.B. returned to Johnson's house on June 20, 2017. Two days later, T.B. posted Backpage advertisements to earn some money. T.B. "felt bad" because

---

[2] T.B. testified under partial immunity, whereby her statements made at trial could not be used against her, but she still could be prosecuted for the crimes she discussed.

Johnson had been taking care of her and she wanted to help pay for some bills. T.B. testified that she never got any money from these advertisements. Eventually, T.B. told Johnson about the advertisements, explaining to him "there was only one way of getting money" that she knew and it was through prostitution. T.B. asked Johnson to use his phone to post more advertisements. She denied ever making money from the advertisements.

T.B. testified that she was arrested on June 27, 2017 in connection with a home invasion and taken to juvenile hall. She told the investigating officer that she wanted to go to juvenile hall because it was better than prostituting herself. While at juvenile hall, T.B. called Johnson and sent him letters referring to him as "daddy." "Daddy" is a common term for pimp. Johnson sent her letters with drawings of snowmen and money signs. T.B. denied ever seeing the letters; she admitted that in the Backpage ads she referred to herself as a "snow bunny."

T.B. was later placed in a group home, but she ran away after a few weeks. Maddy, another girl at the group home, ran away with her. T.B. earned money for a bus ticket back to Johnson's house by engaging in prostitution. Upon her return, T.B. and Johnson resumed their sexual relationship. T.B. then posted more Backpage advertisements in an effort to prostitute herself again.

T.B. admitted that on October 24, 2017 she texted with a girl named Julia to see if she was interested in doing a "two girl special" in San Francisco. When Julia asked about how much money T.B. had been earning, T.B. texted, "Girl, you know it depends every day is different." Later that day, T.B. texted Julia it was time to head out and get to work.

T.B. testified that she could not remember if she made money on October 24, 2017. T.B. did admit, however, that in an October 25 text, when

3

Maddy asked if she was getting any money, she replied, "Girl, duh". T.B. admitted this response meant that she had been earning money. That same day, T.B. texted Johnson a picture of herself holding wads of cash. Although T.B. felt like she "owed" Johnson money because he had been giving her a place to stay and giving her food, she denied giving Johnson any of the money she earned that day. On October 25, T.B. also texted Johnson, "We not getting no where money wise," to which he responded, "Because you wasn't trying to get no money." T.B. replied, "Yes I was you didn't put me on."

On October 26, 2017, T.B. and Johnson texted each other about T.B. prostituting herself. Johnson texted T.B. warning her that she better come back with some money. When T.B. texted that the "Homeboy" she had been with did not have the money, Johnson reprimanded her for being at his house. T.B. admitted that Johnson told her to go to the "blade"[3] to make money and instructed her to bring the money back to him. Although her text message indicated that she agreed to go to the blade, T.B. testified that she did not go to the blade that evening.

T.B. was contacted by an officer on the blade on October 27, 2017 and brought in for questioning. Detective Adam Brunie interviewed T.B. at the police station. Detective Brunie saw her place $40 in her bra before he began the interview. She told him that she made $70 that evening from "hoeing" and an additional $40 from babysitting. She said the money she placed in her bra was from babysitting and the other money she made that day was "gone" because she "put it in the bank." T.B. told him that she did not want to be a prostitute and wanted to live with her father, though she said she could not

---

[3] The blade or "working the blade" means actual street walking as opposed to internet-based prostitution.

do so at that time. She told Detective Brunie that she had been dating Johnson for six months.

During the interview, Detective Brunie told T.B. that he would provide services for her whether or not she gave him the name of her pimp. She denied having a pimp until Detective Brunie mentioned that the police could obtain a protective order if she provided the name of her pimp. She then asked for a pen and notepad, and wrote down Johnson's name. T.B. told Detective Brunie that she and Johnson "needed some money." She explained that they had been living at Johnson's mom's house and his mom was upset about T.B. staying there. At first, Johnson tried to make some extra money by selling bikes or fishing poles. Johnson and T.B. agreed that if his sales attempts did not work, then she would earn money through prostitution. T.B. told Detective Brunie that this was a "joint" plan in which she and Johnson agreed to split the proceeds from her prostitution. T.B. admitted that Johnson told her that they needed to proceed with the plan to earn money through prostitution.

T.B. told Detective Brunie that she and Johnson planned to get a hotel on the day she was brought in for questioning, which Detective Brunie believed meant that they "would get a hotel room and split the money." T.B. told Detective Brunie that Johnson would be upset if she did not return that evening.

T.B. consented to a sexual assault exam (SART) after speaking with Detective Brunie. T.B. initially told the examining nurse that Johnson was her boyfriend and that they had been dating for approximately six months. When asked for further clarification about whether Johnson was her boyfriend, T.B. told the nurse, "well, kind of. He's my pimp."

Detective Brunie testified as an expert in pimping, pandering and the associated vernacular. Some of the common characteristics that human trafficking victims share or tend to exhibit are a history of being a runaway, low self-esteem, developmental disabilities and substance abuse.

An adult pimp or panderer typically exhibits power and control over a minor victim akin to that in the domestic violence arena. Isolation, economic dependence, emotional, physical and sexual violence, and affection and economic support are typical components of the power exerted by a pimp or panderer. Minor human trafficking victims typically do not see themselves as victims. Minors view their pimp as a family member or boyfriend and want to protect their pimp based on loyalty, trust and love. In Detective Brunie's training and experience, minors do not want to identify their pimp for fear of being labeled a snitch. When Detective Brunie asked T.B. the number one rule during her interview, she said it was "don't tell the name of your pimp."

Detective Brunie testified that the Backpage ads associated with Johnson's and T.B.'s cell phones contain terminology unique to the prostitution trade. For example, one ad said, "just arrived, new in town," which could indicate the prostitute was a younger person. The call back number placed in the ads belonged to Johnson. That meant Johnson's number had to be called in order to set up the date. Ads that said "snow bunny" and "21" told the customer the female was young, but said 21 years of age in order to avoid law enforcement interest. The reference in some of the ads to "no AA," meant no African-Americans, which signaled that the advertiser had a pimp.

The October 2017 ads did not reference Johnson's cell phone number, but bore the number of the phone Johnson gave to T.B. This suggested Johnson could be in control of T.B.'s communications with clients. Texts

6

between Johnson and T.B. confirmed that Johnson had been controlling T.B.'s communication with clients. In Detective Brunie's opinion, this was a form of pimping and pandering.

Based on a hypothetical mirroring the facts of the case, Detective Brunie opined that Johnson was trafficking, pimping, and pandering T.B.

## DISCUSSION

### 1. Substantial Evidence Supports Johnson's Pimping Conviction

#### A. *Standard of Review*

The principles governing appellate review of a substantial evidence challenge to a conviction are well settled. To assess the sufficiency of the evidence, we review the whole record in the light most favorable to the prosecution, presuming in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence to determine whether there is substantial evidence to support the verdict. (*People v. Mendez* (2019) 7 Cal.5th 680, 702.) That is, we look for " 'evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.)

The standard of review is the same even where the case against the defendant was based primarily on circumstantial evidence. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) On appeal, "our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might reasonably be reconciled with the defendant's innocence." (*People v. Zaragoza* (2016) 1 Cal.5th 21, 44; *People v. Manibusan* (2013) 58 Cal.4th 40, 92.) Rather, "[i]t is the duty of the jury to acquit the defendant if it finds the circumstantial evidence is susceptible to two interpretations, one of which suggests guilt and the other innocence." (*Zaragoza*, at p. 44.)

7

And "[w]here the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*People v. Zamudio* (2008) 43 Cal.4th 327, 358.) Indeed, we will not reverse a judgment of conviction for insufficient evidence lest " 'it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Id.* at p. 357.) Moreover, " 'unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Ghobrial* (2018) 5 Cal.5th 250, 281.)

>    B.    *Analysis*

Section 266h, subdivision (a), defines pimping as follows: "Except as provided in subdivision (b), any person who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution . . . is guilty" of pimping. To prove the pimping count, the prosecution had to prove that Johnson knew T.B. was a prostitute and that Johnson derived support or maintenance, in whole or in part, from T.B.'s earnings as a prostitute. (*People v. Guyton* (2018) 20 Cal.App.5th 499, 506; *People v. Scally* (2015) 243 Cal.App.4th 285, 292; CALCRIM No. 1150.) Johnson challenges only the evidence to support the latter element.

Johnson contends there was no evidence that T.B. actually earned money from prostitution and/or to the extent she did earn money from prostitution there is no evidence he received any such money from T.B. We disagree.

There is ample evidence T.B. earned money from prostitution. T.B. testified that she wanted to help Johnson pay for living expenses and the only

way she knew how to make money was through prostitution. The jury was entitled to discredit T.B.'s testimony that she never gave Johnson any money. Although T.B. denied making money from the internet ads, she admitted she told Julia that she earned money from prostitution and the amount varied depending on the day. T.B. also admitted that she told Maddy that she had been earning money from prostitution. T.B. sent Johnson a picture of herself holding wads of cash. Finally, at the time she was brought into the station for questioning, T.B. admitted to having earned $70 from "hoeing."

There is also substantial evidence Johnson derived a benefit from T.B.'s prostitution. That Johnson provided T.B. with room and board, supplied her with a cell phone, told her to go to the blade and come back with money, and expressed anger when T.B. had a date who could not pay her is evidence from which it may be inferred that he had a financial stake in her welfare and expected to benefit from her prostitution activities. Even if it were conceivable his interests were altruistic rather than pecuniary, this possibility does not compel reversal. "Where the circumstances support the trier of fact's finding of guilt, an appellate court cannot reverse merely because it believes the evidence is reasonably reconciled with the defendant's innocence." (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1747.) Despite a plausible theory of innocence, we must affirm if " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Earp* (1999) 20 Cal.4th 826, 887.)

Looking at the circumstances of this case and construing them, as we must, in the light most favorable to the prosecution (*People v. Earp, supra,* 20 Cal.4th at pp. 887-888), there is substantial evidence Johnson derived support from T.B.'s prostitution. Johnson's phone number was the main point of contact listed on numerous internet postings advertising T.B.'s services.

T.B. and Johnson had a joint plan to split the money she earned from prostitution. On the night she was questioned by police, T.B admitted that she made $70 from "hoeing" and the plan was to get a hotel with Johnson that night. Even though Johnson did not receive the money that night, it is reasonable to infer that over the course of the several months that T.B. lived with Johnson he derived some benefit from her prostitution. Johnson not only knew T.B. was a prostitute but also aided and controlled her prostitution. Combined, these facts strongly suggest that Johnson was in the business to make money and that he derived support from T.B.'s prostitution. We therefore find substantial evidence to support his conviction for pimping.

**2.    Requested Remand for Resentencing Under Senate Bill No. 567**

Senate Bill No. 567 (2021–2022 Reg. Sess.) recently amended section 1170, subdivision (b), to specify that, when a sentencing court chooses a term from a statutory triad, the chosen term shall not exceed the middle term, unless the facts supporting the aggravating circumstances are (1) established by the defendant's stipulation, (2) proven to a jury (or to a court, if jury is waived) beyond a reasonable doubt, or (3) based on prior convictions evidenced by a certified record of conviction. (Stats. 2021, ch. 731, §§ 1.3, 3, subd. (c), adding § 1170, subd. (b)(1)–(3), by amendment.) Senate Bill No. 567 also added a provision that requires the trial court to impose the low term if the defendant's psychological, physical, or childhood trauma was a contributing factor in the commission of the offense, "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances [so] that imposition of the lower term would be contrary to the interests of justice." (Stats. 2021, ch. 731, §§ 1.3, 3, subd. (c), adding § 1170, subd. (b)(6), by amendment.)

The trial court here imposed the upper term of 12 years for the trafficking offense (count 1). The parties agree that the above-mentioned ameliorative amendments apply retroactively to this case, and the matter should be remanded for resentencing under current section 1170. We agree. (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1038–1039 [remanding for resentencing under section 1170 as amended by Senate Bill No. 567].)

## DISPOSITION

Johnson's sentence is conditionally vacated, and on remand the court shall resentence him in accordance with newly enacted section 1170, subdivisions (b)(1)–(3) and (b)(6). The judgment is otherwise affirmed.


GOLDMAN, J.


WE CONCUR:

POLLAK, P. J.
STREETER, J.

11