Filed 1/5/24  P. v. McElvane  CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DOMINIC MCELVANE,<br><br>Defendant and Appellant. | F085037<br><br>(Super. Ct. No. 20CR-04015A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Merced County.  Carol K. Ash and Ronald W. Hansen, Judges.*

Rex Adam Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and John Merritt, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

* Judge Ash presided over McElvane's preliminary hearing and jury trial; Judge Hansen, a retired judge of the Merced Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution, presided over his change of plea hearing as to count 1 and pronounced his sentence.

# INTRODUCTION

The Office of the District Attorney of Merced County filed an information charging Dominic McElvane and Khaleiah Dixon[1] with trafficking Gloria L., a minor, by force (Pen. Code, § 236.1, subd. (c)(2);[2] count 1), and trafficking L.M., a minor, (§ 236.1, subd. (c)(1); count 2). McElvane was further charged with a prior strike conviction (§§ 667, 1170.12). On August 17, 2022, the jury reached a verdict on count 2 but not on count 1. The trial court declared a mistrial as to count 1 on August 18, 2022.

The trial court granted the People's motion to amend count 1 to a charge of trafficking a minor without force (§ 236.1, subd. (c)(1)). The parties reached a settlement in which McElvane waived his constitutional rights pursuant to *Boykin*/*Tahl*,[3] waived his right to a probation officer's report, admitted the allegation and the prior strike conviction, and received a stipulated prison term of 21 years and four months as follows: the midterm of eight years on count 2, doubled by the prior strike conviction to 16 years; plus a consecutive sentence of one-third the midterm of two years and eight months on count 2, doubled by the prior strike conviction to five years and four months.

On January 1, 2023, Evidence Code section 352.2 became effective. (Stats. 2022, ch. 973, § 2.) It requires trial courts to scrutinize more carefully the admissibility of forms of creative expression evidence (e.g., rap lyrics) that purportedly tie criminal defendants to crimes they have allegedly committed so as to prevent the implicit or explicit injection of racial bias into proceedings. Although McElvane was tried in 2022, he contends that Evidence Code section 352.2 applies retroactively to him, he was unduly

---

[1]  In a pretrial brief, defense counsel stated Dixon entered into a plea agreement prior to McElvane's trial. Records of Dixon's conviction in this case were admitted into evidence as defense exhibits.

[2]  Unspecified statutory citations are to the Penal Code.

[3]  *Boykin v. Alabama* (1969) 395 U.S. 238, 242–244; *In re Tahl* (1969) 1 Cal.3d 122, 131–134.

prejudiced by the introduction of his rap video into evidence, necessitating a new trial, and that this court should find the video inadmissible in a retrial. McElvane further contends that an amendment during trial of the date of the offense alleged in the information as to count 2 violated his due process right to a fair trial. We reject these contentions and affirm the judgment.

## FACTS

### *Gloria L. Begins Working for McElvane*

Gloria L. was born in 2002. She grew up in Fresno and was 17 years old in June and July 2020.[4] Gloria was 13 years old when she met Dixon. Gloria referred to Dixon as Kalani. Gloria met Dixon at school or juvenile hall. Gloria had juvenile adjudications for attempted robbery in 2017 and battery of a police officer in 2019.

Gloria ran away from a group home in 2020 but could not remember where she stayed afterward. Gloria saw Dixon in Fresno in June of 2020.[5] Dixon asked Gloria to leave town with her. Gloria agreed to do so.[6] Gloria began "chilling" with Dixon in Fresno until Dixon left town. Dixon arranged for Gloria to get a train ticket to Los Angeles. The plan for Gloria was to make money for McElvane by selling herself for sexual acts. Dixon introduced Gloria to "the game" because Gloria had not previously been a sex worker.

Gloria knew McElvane as Cashoutt.[7] Prior to leaving for Los Angeles, McElvane sent voice messages to Gloria's cell phone, and they exchanged text messages. When

---

[4]    Because Gloria and the other victim, L.M., were minors at the time of the allegations, we do not set forth the month or date of their births. We have verified that both victims were minors under age 18 during the events reviewed herein.

[5]    Subsequent references to dates are to dates in the year 2020, unless otherwise stated.

[6]    Gloria first met McElvane when he and Gloria were briefly in Fresno prior to Gloria leaving Fresno for Los Angeles.

[7]    McElvane's moniker, or nickname, is spelled differently throughout the record. Depending on who is reporting testimony or transcribing recordings, he is variously referred to, or his nickname is spelled, as Cashoutt, Cashouttdomo, Cashoutt Domo, Cashout, and cashout

Gloria arrived in Los Angeles, McElvane and Dixon had arranged for Gloria to meet them by sending her an Uber or Lyft ride. Gloria arrived in Los Angeles with a fanny pack, the clothes she was wearing, and no money. Dixon provided her with clothes. Gloria planned to stay with Dixon and for McElvane to provide her food in exchange for Gloria selling her body.

Gloria met Dixon, McElvane, and L.M. in a hotel room. Gloria changed into the clothes provided by Dixon. The four got into a car driven by McElvane; Dixon sat in the front seat and Gloria and L.M. sat in the back seats. McElvane drove them to Figueroa Street. Gloria and L.M. exited the car, and McElvane told Gloria to give him a sign when she got a date, which meant Gloria was exchanging sex for money. All of Gloria's "dates" took place in McElvane's car, not in hotel rooms, and involved oral sex for $80 or sexual intercourse for $100. Gloria saw L.M. go on dates in the car and received text messages from her that she was with a "John." Gloria was with the group in Los Angeles for a couple of weeks and only slept one evening in a hotel. When asked if she testified at the preliminary hearing to staying in Los Angeles just a matter of days, Gloria replied, "Yeah."

Gloria performed more than 10 sexual acts a day while in Los Angeles. She would make $800 or $900 a day. After being paid, Gloria gave the money to Dixon who gave it to McElvane. Gloria was not allowed to keep any money. McElvane did pay for Gloria to have her nails done.

Gloria identified the ticket she used to travel from Fresno to Los Angeles.[8] Gloria identified a photograph of herself with L.M. while they were in Los Angeles and another of herself after she got her nails done. Two photographs of Gloria together with L.M. wearing a dress and Dixon while they were on Figueroa Street were admitted into

_____

domo. All versions refer to McElvane and we use them interchangeably as they are referenced in the record.

[8] The ticket bears Dixon's name and is dated June 28.

evidence. Someone took the pictures as a photoshoot. Another photograph from the same photoshoot depicted Gloria wearing a colorful outfit, holding a bottle of alcohol.

The car was always driven by McElvane or Dixon. Gloria and L.M. never drove. Between McElvane and Dixon, McElvane was in charge. Dixon answered to McElvane "[e]very time" and was not allowed to do whatever she wanted without McElvane's permission. McElvane made Gloria stay out all night. She felt she had nowhere else to go. Every day, Gloria smoked marijuana provided by McElvane. McElvane or Dixon purchased alcohol for Gloria to drink. Gloria also consumed stimulants while she worked for McElvane.

### Gloria's Discontentment with McElvane and His Arrest

McElvane drove everyone to Fresno on the way to Oakland where Gloria expected to continue working for McElvane. In Fresno, McElvane stopped at an apartment and went inside with Dixon for several hours while Gloria and L.M. remained in the car. She and L.M. got out of the car to try to find McElvane and Dixon in the apartment. Gloria thought about leaving but had no ride. When McElvane and Dixon finally returned, they headed to Oakland.

While still in Fresno, Gloria asked McElvane to take her home so she could pick up the clothes she had forgotten to bring with her to Los Angeles. McElvane refused Gloria's request because they had just taken the freeway. McElvane became angry and started cursing at Gloria. He told her she was going to continue working in Oakland. Gloria was tired and no longer wanted to work for McElvane and just wanted to go home. Gloria remained quiet and was crying. She began texting the police.[9] She also texted McElvane or Dixon that she wanted to return home.

---

**9**      Gloria's 911 text was admitted into evidence. She told the emergency dispatcher that she and her friend were 17 years old and in a situation where a pimp was trying to hit on them. Gloria explained she was scared, they were driving north on Highway 99 toward Sacramento in a grey Kia, and she was not sure of their exact location.

While Dixon was driving, Gloria told McElvane that she did not want to work for him in Oakland without her own clothes. McElvane yelled at Gloria and L.M. and told Dixon to pull over on the side of the freeway. Gloria was crying but did not argue with McElvane. McElvane told Gloria that once they were in Oakland, she and L.M. were going to get out of the car to get some money. To Gloria, this meant she had to continue selling her body. Gloria thought she would be kicked out of the car for saying something back to McElvane. Gloria had seen Dixon arguing with McElvane and McElvane punch or slap Dixon in the face.

Although Gloria wanted to get out of the car, she had nowhere to go and no one to call. McElvane asked Dixon, "[Y]ou want this bitch to stay with us or you want me to kick her out the car?" Dixon said nothing, but Gloria believed that if Dixon had said yes, McElvane would have kicked Gloria out of the car along the freeway. Although Dixon told McElvane it was up to him, they did not expel Gloria from the car along the freeway. Gloria remained in the car until the police pulled them over. Gloria was nervous about talking to the police.

McElvane told Gloria to not tell officers anything and to delete everything on her phone. Gloria deleted everything from her phone when officers pulled them over as McElvane instructed her to do but did this so it would appear that she had not contacted law enforcement. Because Gloria was worried about outstanding warrants, she gave officers her older sister's name and birthdate. Gloria denied telling California Highway Patrol Officer Talbot that if she was stopped by law enforcement that McElvane told her to use her older sister's birthdate. Even though Gloria used her older sister's birthdate, she told officers that she was a minor. Gloria denied working as a prostitute prior to traveling to Los Angeles. Dixon introduced Gloria to "the game" after Gloria was in Los Angeles.

Dixon later posted on Facebook that Gloria was cooperating with law enforcement using "paperwork," or police reports, with Gloria's nickname on them. Dixon was

6.

publicizing on the Internet that someone had talked. This upset Gloria. She was also upset with law enforcement for using her nickname in official documents because everyone in Fresno knew her by this name. It made Gloria fearful to cooperate. She explained in her testimony: "Eventually I'm going to get killed but I don't care. If they come for me, they come for me."

Talbot began following the car Dixon was driving in Merced County and stopped it north of Merced to investigate a report to 911 about human trafficking. The backseat passengers were Gloria and L.M. Both were minors. At first, Gloria gave Talbot a fake name and date of birth as though she was trying to hide something. McElvane and Dixon were both on the scene. After Talbot separated Gloria from them by taking her behind the patrol car, she became more forthcoming and calmed down.

Gloria gave Talbot her actual name and date of birth, showing that she was a minor. Gloria explained that McElvane told her to provide a false name to make it appear she was older. When Talbot tried to talk to L.M., she would not answer questions and was rude to him. L.M. was adamant that she was 19 years old but had a baby face; to Talbot she appeared at most 16 years old, playing dress up. Later in the office, L.M. provided her true name and date of birth. Dixon and McElvane were not in the California Highway Patrol office. Dixon was cited and released at the scene. McElvane was transported to Merced County Jail for booking.

### L.M.'s Testimony

L.M. was born in 2007 and was 13 years old in June and July. L.M. knew Dixon as Kalani and McElvane as Cashoutt. L.M. did not know McElvane's "government name." L.M. first met Dixon in 2019 when they lived in the same apartment complex in Fresno. L.M. met McElvane through Dixon.

L.M. talked to Dixon about going down to Los Angeles to do what Dixon was doing, work as a prostitute. L.M. said she saw McElvane in the apartment building once but most of the time communicated with Dixon. L.M. traveled to Los Angeles by

7.

Greyhound bus, leaving Fresno with no money. L.M. did bring her own clothes in a bag. One of her mother's friends bought her ticket. L.M. took an Uber to the hotel room where Dixon was staying. The hotel was down the street from Figueroa, where prostitutes worked. L.M. asserted she only talked to Dixon, not to McElvane, about how to work as a prostitute.

L.M. spoke to McElvane when she arrived but was unsure if he knew her age or why she was in the city. McElvane was present for conversations in which she and Dixon discussed the rules for prostitution. L.M. denied telling a detective that she had discussed the rules with McElvane or that he provided her with clothes to wear. L.M. worked on Figueroa for a few days in late June before Gloria arrived.

L.M. worked during the day and evening. L.M. defined a "date" as a "trick," or someone who pays for sex. L.M. said she mostly performed oral sex and did not think she did much sexual intercourse. Dates would take place in the car or the hotel room. After getting money, L.M. would give it to Dixon. L.M. did not recall if she saw Dixon give McElvane the money, but L.M. expected Dixon to do so because McElvane was Dixon's boyfriend. L.M. did not recall telling a detective that when McElvane received money he would tell L.M. she did a good job. L.M. claimed Dixon was really "the pimp."

L.M. did recall telling a detective that she made between $500 and $1,000 an evening. Although L.M. never kept any of the money she made, she said it was spent on her. L.M. did not recall telling a detective that she performed oral sex on McElvane once because Dixon was McElvane's boyfriend. L.M. denied there was a time when McElvane was in bed with her because when they were in a room, he would sleep with Dixon and L.M. would share a bed with Gloria. L.M. denied using drugs or alcohol while in Los Angeles.

L.M. explained she ate three meals a day and had enough clothes. Dixon paid for L.M. to get her nails done. The group left Los Angeles on July 3. When the group

8.

arrived in Fresno, Gloria and L.M. exited the car and went to a friend's house. McElvane and Dixon were at L.M.'s mother's residence. Gloria was not upset during their stay in Fresno but became upset when they were on the freeway leaving town and she asked to pick up her clothes in Fresno. There was a disagreement, but it was conversational, not angry. No one yelled at Gloria, and Gloria never cried.

L.M. remembered them being pulled over by law enforcement in Merced County. L.M. gave officers a false name and date of birth, stating her age as 19 years old. L.M. denied being a runaway, though she admitted she did not tell her mother where she was going. L.M. told officers that no one made her do anything in Los Angeles. L.M. said she chose to do what she wanted to do and no one forced her. L.M. claimed everything she told the officers was fake. When they were pulled over, L.M. was worried about McElvane and Dixon getting in trouble for what L.M. chose to do.

***Detective Johnson Testifies About L.M.'s Prior Inconsistent Statements***

Detective Satwan Johnson worked for the Long Beach Police Department's vice investigations detail and investigated human trafficking cases, massage parlors, prostitution, illegal gambling, and overconsumption of alcohol in bars. Johnson had investigated thousands of prostitution and human trafficking cases. Johnson began training in human trafficking investigations in 2007 and had completed over 1,000 hours of classes. He was familiar with the terminology used by human traffickers.

On September 24, L.M. was questioned by Johnson in a recorded video and audio interview. Investigators had seized L.M.'s cell phone. She was afraid but very cooperative with Johnson.

L.M. knew McElvane by his moniker, Cashouttdomo, and was introduced to him by Dixon. Dixon introduced L.M. to the idea of working as a commercial sex worker. The first two conversations L.M. had with McElvane were by cell phone, and there was no mention of commercial sex. During a third conversation, McElvane told L.M. that he could not wait "until she came 'home.' " The phrase "come home" is used in commercial

9.

sex to mean come work for me as my (the pimp's) worker. L.M. understood the phrase to mean that she would be Dixon's "wifey" and would give all of the proceeds she earned committing acts of commercial sex to McElvane. A "wifey" is another sex worker who is under the same stable, meaning that they both work for the same sex trafficker or pimp.

L.M. told Johnson that she convinced her father to buy her a Greyhound bus ticket to Los Angeles, where McElvane arranged for Uber transportation from the bus station to a hotel on Hoover Street. This hotel is only four blocks from Figueroa Street, a prostitution track. McElvane told L.M. his rules, which included not contacting other pimps and walking away if another pimp exited his car and approached her. McElvane and Dixon provided L.M. with a clear two-piece outfit with Louis Vuitton LV symbols to wear while she performed commercial sex acts. McElvane directed Dixon to take L.M. to the Figueroa prostitution track. Dixon instructed L.M. how to perform commercial sex acts and to charge $60 or more for each act.

L.M. said her first few dates were car dates. On each date she received $150 for oral sex. The third sex act was a double date she performed with Dixon and two males. They received $60 each for oral sex. On the fourth date, L.M. received $200 for performing oral and vaginal sex on a male. L.M. handed all of the money she received to Dixon. When they returned to the hotel, Dixon handed the money to McElvane who told L.M. she did a good job.

The following morning, a female named Gloria arrived from Fresno and worked with them on the Figueroa and Western prostitution tracks. L.M. and Gloria performed double dates together. A male paid them $180 to have sex together in the hotel room. L.M. and Gloria were not into this act, which upset the male. Because McElvane was outside the room, the male did nothing. L.M. explained that she worked in Los Angeles from June 26 or 27 until July 3. L.M. did not have vaginal sex with McElvane but performed oral sex on him once while they were lying in bed together. L.M. made between $500 and $1,000 an evening and gave the money to McElvane. The hotel rooms

10.

they stayed in were registered to McElvane under his birth name. Johnson had a conversation with L.M. at the hotel they were both staying for the trial. L.M. stated concern that McElvane would see her as a snitch.

*Social Media Messages*

District Attorney Investigator Fausto Lopez received search warrant returns for Facebook, Instagram, and Snapchat accounts. From Dixon's Facebook account, there was an instant message from June 23, conversing with someone who used Gloria's nickname and trying to convince her to go to Los Angeles. Dixon told this person that she was going to make some money. A video of McElvane counting money was sent on June 28 via Dixon's Facebook account to the person. The person responded that she did not want to put money into someone else's pocket and stated her age as 17 and a half years old. Dixon responded that McElvane was aware of the person's age.

Audio messages from McElvane were in the communication between these accounts. Lopez identified McElvane's voice from YouTube music videos and other Instagrams. In a June 28 message, McElvane told the person using Gloria's nickname to make up her mind, that she had no money, and she expected him to pay for her ticket to Los Angeles. The two appeared to be arguing over who was going to pay for the ticket.

*Human Trafficking Expert*

District Attorney Investigator Sheri Carpenter had extensive training in human trafficking cases and worked primarily with these investigations. The court received her as an expert in human trafficking cases. Carpenter investigated this case.

Carpenter explained several terms and phrases used by sex traffickers starting with "daddy," which is a term pimps require their sex workers to call them. A "date" is a commercial sex arrangement between a "trick" or a "John" and the sex worker. "Hoeing" is prostitution, and a "pimp" is a trafficker exploiting sex workers for commercial sex. "The game" refers to the rules of the game for acting as a sex worker and "the life" refers to the subculture of pimping or being a sex worker. Pimps often use

11.

the word "bitch" to describe their sex workers. Carpenter explained that if you flip the numbers "3-0-4," they spell "hoe."

The term "real one" refers to an actual pimp or sex worker versus someone who is not really in the life. "Bag" refers to money. Having a "dude" refers to having a pimp that one works for. "Bands" refers to money and can sometimes refer to $1,000 or a lot of money. "Stacking bands" is making money. "Trapping" in the pimping and pandering subculture is a reference to sex work, and "knocking" occurs when pimps look at sex workers or try to get them to work for the pimps. A "stable" refers to multiple sex workers working for one pimp.

Sex workers refer to one another with the term "wifey" or "wife-in-law." The letter "P" and the number "16" refer to a pimp. "In pocket" is a phrase used to indicate sex workers are on good terms and following the rules. "Quota" is the amount of money the pimp expects the sex worker to earn in one day or night. A "bottom" is the most senior sex worker under the pimp. She is someone who helps with recruiting, makes sure the sex workers know the rules, usually makes the most money, and has been with the pimp the longest. "Team" refers to the pimp's team and "f[*]g[**]d off" is a derogatory term used for someone who leaves the pimp. "Paperwork" refers to a police report, and being "on paperwork" means someone is a snitch talking to law enforcement.

Carpenter explained human trafficking victims tend to be younger people who have run away from home or unstable backgrounds such as foster care or group homes. There are other risk factors such as alcoholism, drug addiction, and prior sex abuse. The bottom's recruitment therefore focuses on making the sex worker feel part of a family and creating a sense of belonging. The senior sex worker also does much of the pimp's bidding, acting as a liaison and a manager.

Sex workers are often reluctant to participate in law enforcement investigations because they don't want to be a snitch, or they can also feel as though they are in a boyfriend/girlfriend relationship with the pimp. The sex workers do not want to wrong

the pimp because they care for or love him.  Sex workers often have a work name to not be detected by law enforcement or to avoid nearby family.  In Carpenter's investigations, she has seen arrangements where the pimp takes all the money and pays for room, food, and marijuana and where the pimp splits money 50/50 with the sex worker.  Pimps control sex workers by providing them with a phone and using an application like 360 to monitor where the sex workers are located.  Where a hotel room is used, the pimp will wait in the parking lot, the bathroom, or an adjoining room while sex acts take place.

Sex workers can either post ads on the Internet or work on "the blade" outside.  Well known "blades," or streets, are Figueroa in Los Angeles and International in Oakland.  At these locations, a sex worker can make over $1,000 a day or night.  In a smaller place, like Merced, a sex worker could make $100 to $200 a day.  Another name for a blade is a "track."

Popular sex trafficking blades can go "dry," so pimps like to move around.  Moving around also makes it easier to control sex workers because it is more difficult for friends and family to find loved ones.  New sex workers are groomed.  They are shown how to dress, told how to talk, and prepared for a life as a sex worker.  Social media is used to recruit new sex workers.  Pimps and sex workers advertise and brag about themselves on social media.  Recruitment happens through private messaging.  Pimps flash money, ask recruits to make money with them, and present prostitution as glamourous.  The social media most commonly used are Instagram, Facebook, and Snapchat.

Common signs and emojis used by pimps in their social media communications include the letter "P" in a blue box, the numbers "3-0-4" or "#304," high heels, and the money bag.  Sex workers are often tattooed, or branded, with the pimp's name or moniker.  Pimps will often tattoo the names of their sex workers on themselves to show they have them.  Carpenter knew that Dixon's moniker was Kalani and McElvane's was Cashouttdomo.

13.

### *Recorded Jailhouse Phone Conversations with McElvane*

Pimps in jail still have their sex workers, especially the senior ones, working for them even though the pimp is incarcerated. Carpenter described this as going on "automatic." Merced County Jail utilizes a service called Global Tel Link to record all calls made by inmates. Inmates use a Personal Identification Number (PIN) when making a call, which is then recorded under that inmate's name.

Carpenter accessed and listened to McElvane's recorded calls from jail. McElvane made some calls from jail using a different PIN. Carpenter could identify and listen to those calls from the phone number McElvane called because it belonged to Dixon. McElvane told Dixon he would be using a name and PIN that was not his own. Another phone number McElvane called was his mother's. McElvane began making calls on July 5 or 6 and continued until July 16. Carpenter recognized McElvane's voice from watching his social media and listening to his calls from jail. She also recognized other voices, including Dixon's. Recordings of the calls were played to the jury. Jurors were also provided transcripts of the recordings.

Jail call recordings were placed into evidence as part of a series of conversations between McElvane and Dixon that took place on July 6 and 7. McElvane instructed Dixon to contact Gloria and L.M. and figure out what was said. Dixon told McElvane that one of her "homies" was caught for the same offense as McElvane. Dixon said her friend explained if the "bitches" do not go to court, they would not have any evidence because the authorities did not have anyone's phone. Dixon said she thought they did not have anyone's phone because she had her own phone and McElvane's phone was broken. Dixon believed one of the minors, whom she referred to as bitches, still had her phone but she was not sure about the other minor. Carpenter understood the call to mean that if Gloria and L.M. did not go to court, nothing would happen to McElvane; also, there would not be any other evidence without anyone's phone.

14.

Dixon told McElvane she did not come in "til four" and made $450. She "put up" two. McElvane asked if the money was going toward the lawyer. Dixon confirmed it was but said she did not trust herself because McElvane was not there to manage it. Carpenter understood this conversation to mean that Dixon was still working and putting money out of her own reach so she would not spend it.

Dixon confirmed that she was "used [to] running the program." McElvane stated he did not want to be "under other mother fuckers, it's harder." He also told Dixon that he taught her "how to get this shit by yourself even when I'm not around."

Dixon referred to another sex worker named Brooke who was working for Dixon. Brooke's voice was in the background, and Dixon was arguing with her about "hoe money" during the call with McElvane. McElvane asked Dixon why she was talking like that. Dixon replied she was talking "shit to Brooke." McElvane told Dixon he was on the phone and that Dixon's conversation with Brooke was "hella dumb" because "all these phone calls can be used against me in court bruh." McElvane told Dixon that if he calls her from another name, they can talk freely. McElvane asked Dixon what her phone said when he called. Dixon said he was identified by "Dominic." McElvane said that if he called from another inmate's name, it would be him and they could "talk regularly."

Dixon talked to McElvane about "internet bitches" who were advertising on the internet through commercial sex sites, transitioning into coming outside. Carpenter explained this referred to sex workers transitioning from working using the Internet to working outside on the street. Dixon described Brooke as a person walking with Dixon. McElvane told Dixon to go to Hoover and get a room.

In another call, McElvane told Dixon she forgot he was in jail for pimping. He complained that every other time he talks to her, Dixon talked about "hoe" or said "outcall." Carpenter explained that "outcall" refers to a sex worker going to the location of the trick or John for the commercial sex. McElvane continued to complain that they could "play that shit back" and use it against him. McElvane called Dixon a "dumb ass

15.

bitch." McElvane was upset that when Dixon talked to a sex worker while on the phone with McElvane, it was incriminating. He told Dixon to slap herself for him.

Dixon told McElvane that one of the minors was only 13 years old. McElvane, using Gloria's nickname, asked if it was Gloria. Dixon said it was the other girl, using the nickname "S." for L.M. Carpenter believed Dixon was referring to L.M. as the 13-year-old. McElvane reacted to this information with "Oh my God" and "The fuck?" McElvane asked Dixon, "But she didn't say nothing though right?" Dixon replied the minor was in a group home waiting for Dixon to get her out "some kind a way." Dixon told McElvane, "Now that I really know how she is, bitch, I don't want you around me. It's different if you like sixteen seventeen, but thirteen?"

Dixon continued referring to Gloria as the other bitch and as being "the one telling on you or some shit." Dixon told McElvane that at the end of the day, the minors would have to go to court to testify against him before he would "really go to jail." McElvane wanted to know if the group home would take her. Dixon replied, "that bitch went to CPS," but Dixon thought that what a kid had to say "don't mean shit." Dixon, apparently talking about L.M., told L.M. to run away from the group home. McElvane said, "We get caught with the bitch again? Then what?" Dixon explained she was not worried as long as the minor kept her mouth shut. McElvane responded that they did not "know what's up with this other bitch, bruh, so you feel me?" McElvane asked if Gloria had put "n[****]s" in jail before. Dixon replied that Gloria had not.

McElvane was angry at Dixon throughout another conversation for saying things he thought incriminated him. McElvane told Dixon to quit playing him. Dixon responded, "Okay, daddy."

McElvane and Dixon had a conversation on July 8. McElvane mentioned S. Dixon told McElvane to stop including S. because it was "fuck[ing Dixon's] brain up." S. was trying "to do some whole other shit." McElvane should leave S. out of it. Dixon continued: "It's only one bitch that we should be worried about right now and that's the

16.

bitch that's telling that's in juvenile hall." Carpenter understood from the context of the call that the minor talking to authorities referred to Gloria and the one who was not talking to authorities was L.M.

On July 9, McElvane told Dixon, "You're my bottom bitch, you're my top bitch." Dixon responded, "Aww, thank you daddy." Dixon told McElvane she was outside calling a lot of traffic but had not yet busted a date, but she was really trying. McElvane asked Dixon why she was talking like that. McElvane accused Dixon of not caring about his life. She responded that if she did not care about his life, she would not be on the phone with him. McElvane said that did not "mean shit" and all Dixon was doing was incriminating him "every time." McElvane asked Dixon to "slap $500 on [his] books and stop fucking with [him.]"

Carpenter said the reference "fuck with me" meant Dixon was still working for McElvane. The reference to "top bitch" meant Dixon was McElvane's most senior sex worker. On July 8, Dixon referred to sex worker Brooke and working around "grown bitches." Dixon talked about sending an Uber to "scoop" Brooke up, meaning pick her up. Dixon added, "[W]ith both of us that shit will add up."

On July 8, there was a three-way conversation in which Carpenter recognized the voices of McElvane, Dixon, and Gloria. Dixon asked Gloria if the police took her phone and if she told them anything. Gloria denied telling investigators anything. Speaking to Dixon, McElvane said, "She's lying bruh." Gloria told McElvane to shut up. Dixon said one of them "obviously said something because now he's gonna almost get life in jail." Gloria, referring to L.M., said, "She's thirteen she's thirteen and she was telling him shit I won't tell him shit so don't try to come at me like that."

Using Gloria's nickname, McElvane told Dixon how he knew Gloria was lying. McElvane said he heard Gloria in the next room. Dixon used the term "perp bitch" and told Gloria to make sure there was no paperwork. Gloria replied she was not going to "be on no paperwork." After some unintelligible statements, McElvane said it was about him

17.

facing life because of Gloria's statement. Dixon told McElvane, "Bruh, she's a little girl, she think someone tryin to punk her."

On July 8, Dixon told McElvane she did not "think these bitches is going to go to court." McElvane asked if Dixon meant both of them needed to come to court. Dixon replied she did not know. McElvane told Dixon she had to "figure this shit out." Dixon asked, "How am I supposed to figure this out they not tell me anything if they not gonna tell your mom anything."

Two additional conversations were recorded on July 8. The first recording was between McElvane, his mother, and Dixon. The second recording was between McElvane and Dixon. McElvane's mother stated the authorities could still charge him with one count even if the minors did not talk, "just to stick him." McElvane, using Gloria's nickname, said he "highly" thought "the fucking [nickname] bitch said something." McElvane admitted that while sitting in the car he grabbed Dixon's hand and gave her "all the money and everything." McElvane reiterated he "knew that bitch was talkin." Dixon said she told Gloria that McElvane better not be on paperwork or have a court date. In the second recording, McElvane told Dixon, "[A]nd another thing, ma, go ahead and deactivate uh my Facebook." She indicated that she would do so.

On July 10, McElvane asked Dixon if she talked to her neighbor and whether they "makin em come?" After a moment of misunderstanding, Dixon understood what McElvane meant and said they were making them "come to the to the thing." Dixon said, "She went the same day." McElvane asked if this was court. McElvane asked, "My court date, bro." Dixon said, "She went to court … the same day as you." McElvane asked if it was S. or Gloria's nickname. Dixon said it was S. McElvane replied, "Oh my God, bruh, this shit has made my head hurt. Dog, that did almost made me pass out, bitch, my legs just went weak. The fuck?" Carpenter explained that the reference to Dixon's neighbor was to L.M. because they had lived in the same apartment complex in Fresno, and the reference to S. was to L.M.'s nickname.

18.

Two conversations were recorded on July 11. McElvane asked if Dixon was telling him, "[T]his bitch told on me." Dixon replied, "[S]he's gonna testify against you and she's already on paperwork and all that shit." McElvane lamented that they were going to throw the book at him. Dixon responded, "I know." Carpenter explained she understood McElvane and Dixon to be referring to Gloria. McElvane told Dixon there was no point in going to trial and he might as well tell them he is guilty.

On July 13, Dixon wondered "what could she tell on me about." McElvane replied, "[T]hat basically you're my bottom bitch, you're my bottom bitch, you're basically my main chick." Dixon said that they knew that already. McElvane added that Gloria could say Dixon "recruited her to come fuck with us and the whole and do this and do that, ya feel me? And then she could say she been trappin with you." McElvane told Dixon this could put her in jail on a pimping charge. Carpenter explained that "main chick" referred to being the most senior sex worker, "trapping" was sex work or prostitution, and the "she" in the conversation referred to Gloria.

### Additional Evidence

Carpenter obtained a search warrant to seize L.M.'s phone after McElvane's arrest. A forensic extraction was performed by Homeland Security on L.M.'s phone pursuant to the search warrant. A forensic search warrant was also secured for extraction of Gloria's phone. The call logs from Gloria's phone showed calls to a contact named "Daddy" during the time she was in Los Angeles.

A video obtained from L.M.'s Snapchat account depicted L.M. in the forefront wearing a ponytail and Gloria in the background. The time stamp was from June, and it was recorded in Los Angeles. Another of L.M.'s videos also depicted L.M. and Gloria together in Los Angeles on June 30.

A video taken on July 1, extracted from Gloria's phone, showed Gloria and McElvane together in a car with him driving. Three short videos from Gloria's phone

had time stamps between June 29 and June 30 and showed Gloria and L.M. together.  In one of these videos, McElvane was walking behind Gloria and L.M.

L.M. sent three or four voice messages to Gloria about Gloria's argument with McElvane prior to the car being stopped by Talbot.  L.M. accused Gloria of being a snitch.  L.M. warned Gloria that they tried to kick her "dumbass" out on the freeway, but Gloria did not want to get out of the car.  L.M. advised Gloria to "shut the fuck up."

Carpenter reviewed McElvane's Facebook account that was under the name Dominic Davis, a name McElvane mentioned in his jail calls.  Carpenter received Facebook data from Investigator Lopez in September.  The profile picture promoting this account was the same one McElvane used on YouTube for some of his rap videos.  In this account, there was a posted video from January 30 with a female where McElvane talked about pimping.  The action in the video took place in the corner of what appeared to be a hotel room.  McElvane took money from a female hand.  McElvane indicated the money was light and said, "Bitch you wasn't working," and it was "time to go outside." The caption for the video was titled, "We practice in how to collect trap."

The returns for McElvane's accounts were received in August.  In the time after the search warrants were authorized, McElvane and Dixon changed the names on their Instagram accounts.  The two had discussed doing so during jail calls.  In Carpenter's experience, investigation subjects commonly changed social media accounts to escape detection from law enforcement.  Based on McElvane's Instagram account, Carpenter believed he recruited Dixon to work for him in January.

In a series of private messages to L.M.'s account, McElvane discussed the prospect of her coming to Los Angeles to work for him.  McElvane asked her for photographs of L.M. and she sent one.  In another message sent June 27, McElvane asked L.M. how much money she had, which Carpenter interpreted to mean that he wanted L.M. to pay him.

McElvane messaged L.M. again the same day, promising to turn her "into a boss bitch as long as you keep it 100 and you don't do no f[*]g shit, you can hit states with me and [Dixon]." He promised to Uber her to their location "by the blade" when she arrived in town. Carpenter translated the message to mean that McElvane expected L.M. to follow the rules. McElvane further explained that Dixon's whole life changed "when she started fucking with me." Carpenter said McElvane was referring to Dixon beginning working for him as a sex worker. McElvane promised to take care of all of L.M.'s needs if she started the game or began prostituting herself for him.

***"No Love" YouTube Video***

McElvane's "No Love" rap music video was played for the jury and admitted into evidence. The video is four minutes long. The jury was also provided a transcript of the rap lyrics. The rap lyrics describe sex trafficking generally and the viewpoint of a pimp more specifically. The video was posted on YouTube on May 7. McElvane's lyrics are repetitive within stanzas as well as a refrain he uses three times in the video with six long stanzas and a few one- or three-line stanzas. The complete lyrics are attached to the end of our opinion as an appendix, *post*, pages 49–50.

Carpenter explained to the jury how particular phrases in the lyrics referred to human trafficking subculture. The refrain begins with these three lines:

> "Dumb Thot man you gets no love
> "Stupid Bitch man you gets no love
> "Chasing bands only thing that I love"

The third line is repeated three more times in the stanza. Carpenter explained it meant making money.

The next stanza began with these six lines:

> "Comin up I had to get it out the (unintelligible)
> "F[*]g[**]t Bitch say she wanna choose up
> "Tell that bitch I need blue strips huh
> "N[****]s (unintelligible) give two fucks huh
> "I'm getting money out that bitch man (unintelligible)

21.

"Bitch keep lookin at a n[***]a I need a fee"

Carpenter explained a "F[*]g[**]t bitch" is a sex worker that wants to leave or is someone not following the rules. "Bitch keep looking at a n[***]a" and "reckless eyeballing" also refer to a sex worker leaving and not looking at another pimp. "Choosing up" occurs when the sex worker goes to work for another pimp. The reference to "a fee" is the money a sex worker has to pay the pimp to work for him. Later in the same stanza, McElvane raps:

"I'm getting money out this bitch bruh she steady hoe'n
"And all my bitches straight goer's but they straight hoe'n"

Carpenter said the first line statement about getting money refers to a sex worker going on commercial sex dates and paying the pimp. The reference in the second line means that all of the pimp's sex workers are out working on commercial sex dates.

The next stanza after a refrain has the following lines:

"It's another one of your bitches that be bustin dates fo me
"I'm getting money n[****]s hate'n on me"

Another stanza begins with these four lines:

"Stupid bitch wanna choose up, I need a fee
"Stupid bitch wanna fuck with me, I need a fee
"These union dues cost money bitch, I need a fee
"Your talkin to a real 'P' bitch, I need a fee"

Carpenter explained that "bitches that be bustin dates" was a significant line in sex trafficking subculture. The phrase "N[****]s hating on me" and the references to "union dues" and "I need a fee" refer to the choose up fee the sex worker has to pay the pimp. The "real 'P' " reference is a statement that he is a real pimp who has to be paid.

The prosecutor discussed during her closing argument how the evidence fit the elements of each crime. She discussed the contrast in credibility between Gloria and L.M. and the expert testimony concerning the sex trafficking subculture. The prosecutor pointed out that McElvane bragged about being a real pimp on his social media.

22.

The prosecutor turned to the rap video "No Love" and had it played for the jury. The prosecutor argued Carpenter explained that the phrase "f[*]g[**]t bitch says she wants to choose up" is a sex worker who is leaving or choosing another pimp. The prosecutor mentioned other phrases in the video like needing a fee, being a real pimp, and steady hoeing, which Carpenter previously explained meant constantly working to pay the pimp. The prosecutor said that in the video, McElvane referred to himself as a real pimp who needed a fee and how he talked about a fee in messages to L.M. The prosecutor argued that McElvane made his money off girls like 13-year-old L.M. and 17-year-old Gloria.

The prosecutor explained that was how sex traffickers operate and that they target the kind of girls who fall within susceptible categories, such as being in trouble with the law or coming from broken homes with no stable family life. The prosecutor said that while defense counsel wanted to direct the jury's attention to Dixon in order for her to shoulder all of the blame, Dixon worked for McElvane at his direction, and he was her boss. The prosecutor pointed out that Dixon was submissive during her jailhouse calls with McElvane. Dixon reported to McElvane, walked the blade for him, and put money on his books for a lawyer.

The prosecutor then focused on several of McElvane's jail calls to show his consciousness of guilt as a sex trafficker. The prosecutor mentioned calls where McElvane called Dixon his bottom and his top bitch and asked her to slap $500 on his books. The prosecutor also focused on the call in which McElvane said that there was no point in going to court and he may as well plead guilty. McElvane complained in the calls not about Gloria lying, but about how she was a snitch and was on paperwork. McElvane admitted during a call that when they were stopped, he gave Dixon all of the money. The prosecutor argued McElvane was admitting he was the one who had all of the money and that Gloria was telling the truth when she told on him.

The prosecutor's rebuttal argument addressed the dynamic between McElvane and Dixon. The prosecutor talked about Dixon's access to McElvane's social media accounts and his concern during jail conversations that the authorities not be able to get evidence from the minors' phones. The prosecutor argued that McElvane received money from trafficking L.M. and Gloria based off the trafficking dynamic and structure that was set up for him. The prosecutor discussed the victims' credibility. The prosecutor played the three-way jail call between Dixon and McElvane with Gloria but did not replay the rap video. The prosecutor argued McElvane was not just talking to a woman, he was a sex trafficker talking to his bottom. The prosecutor emphasized that there was a wildly disproportionate dynamic between minors only 13 and 17 years old and McElvane who was 27 years old. At 19 years old, it was absurd to believe that Dixon was running the whole operation.

*Defense Case*

When Talbot questioned Gloria after he stopped the car, she told him that she had been detained or arrested for prostitution "plenty of times." On cross-examination, Gloria admitted she and Dixon worked together as prostitutes in Pomona. Gloria elaborated that she was not just trafficking in Los Angeles on Figueroa, but Pomona and "all type of cities," and she went to these cities with McElvane as well as Dixon. Gloria was detained in Pomona for prostitution prior to meeting McElvane.

On redirect examination, Gloria clarified she never worked with another pimp, only with McElvane. Gloria was a sex worker in Pomona with Dixon when there was no pimp involved but also later worked for McElvane with Dixon in Pomona. Previous statements from another hearing by Gloria were also admitted into evidence.

L.M. was recalled as a defense witness and denied working as a prostitute prior to traveling to Los Angeles. Defense counsel showed L.M. an Instagram name that L.M. did not remember. L.M. could not recall if she had a conversation with Dixon where

24.

L.M. admitted she had trapped before. The Instagram that purportedly belonged to L.M. was admitted into evidence.

Records of Dixon's conviction in this case were also admitted into evidence. During closing argument, defense counsel argued that Dixon communicated with Gloria as a peer and it was Dixon who induced Gloria to travel to Los Angeles. It was Dixon who directed Gloria's activities. Both girls knew why they were going to Los Angeles, what they were going to do, and wanted to make money. According to defense counsel, neither minor was forced or threatened to work as a prostitute.

Most importantly, defense counsel argued it was Dixon who did everything from recruiting to giving the minors the rules on the street. Contrary to the People's assertion that McElvane completely controlled everything, it was Dixon who did not submit to everything McElvane wanted. Defense counsel said both minors described Dixon as someone with attitude who spoke her mind and even attacked McElvane once, according to Gloria. Defense counsel argued there was no direct evidence McElvane directed Dixon in recruitment of either minor.

## NEWLY ENACTED EVIDENCE CODE SECTION 352.2

### Introduction

McElvane contends he is entitled to retroactive application of Evidence Code section 352.2 because this statute requires a heightened examination of forms of creative expression. McElvane argues the Legislature enacted the law to stop prosecutors from offering rap lyrics by minority defendants to introduce stereotypes, bias, and character or propensity evidence against defendants. McElvane asserts admission of the rap video was not harmless and the case must be remanded for a new trial in which the video is not admitted absent a careful consideration pursuant to Evidence Code section 352.2.

The People contend that Evidence Code section 352.2 is a procedural change not affecting defendant's punishment and therefore not subject to retroactive application. The People argue that the trial court's in limine Evidence Code section 402 hearing on

25.

the admissibility of the video substantially complied with the new requirements of Evidence Code section 352.2. The People further argue that even if there was error in the admission of McElvane's rap video, the error was harmless in light of the other prosecution evidence against him.

The issue of whether Evidence Code section 352.2 is retroactive is currently pending before the California Supreme Court. We will not attempt to resolve the issue of retroactivity. We review the in limine proceedings to explain the legal limitations of the People's substantial compliance argument. We find the evidence against McElvane so substantial that even assuming it was error to admit his rap video into evidence, the error is harmless beyond a reasonable doubt.

***Retroactivity***

On September 30, 2022, the Governor approved Assembly Bill No. 2799 (2021–2022 Reg. Sess.). Effective January 1, 2023, this bill added Evidence Code section 352.2, subdivision (a), which states:

> "In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under [Evidence Code s]ection 352, shall consider, in addition to the factors listed in [Evidence Code s]ection 352, that: (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of [Evidence Code s]ection 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings." (Evid. Code, § 352.2, subd. (a), added by Stats. 2022, ch. 973, § 2.)

26.

Subdivision (b) of Evidence Code section 352.2 further directs trial courts to consider the following criteria in assessing the admissibility of a defendant's creative expression:

> "If proffered and relevant to the issues in the case, the court shall consider the following as well as any additional relevant evidence offered by either party: [¶] (1) Credible testimony on the genre of creative expression as to the social or cultural context, rules, conventions, and artistic techniques of the expression. [¶] (2) Experimental or social science research demonstrating that the introduction of a particular type of expression explicitly or implicitly introduces racial bias into the proceedings. [¶] (3) Evidence to rebut such research or testimony." (Evid. Code, § 352.2, subd. (b).)

Evidence Code section 352.2, subdivision (c) defines "creative expression" as including, but not limited to, "music, dance, performance art, visual art, poetry, literature, film, and other such objects or media." Evidence Code section 352.2, subdivision (d) provides that the admissibility of a form of creative expression shall be heard in limine and determined by the court, outside the jury's presence, and the court "shall state on the record its ruling and its reasons therefor."

There is currently a split of authority regarding whether Assembly Bill No. 2799 (2021–2022 Reg. Sess.) should be deemed retroactive to criminal matters not yet final on appeal. (See *People v. Venable* (2023) 88 Cal.App.5th 445, 456–457 (*Venable*) [Evid. Code, § 352.2 should be deemed retroactive], review granted May 17, 2023, S279081; cf. *People v. Ramos* (2023) 90 Cal.App.5th 578, 596 (*Ramos*) [Evid. Code, § 352.2 does not apply retroactively], review granted July 12, 2023, S280073.) Although this issue is currently pending before our high court, we briefly review the facts and rationale of each case to guide our own prejudice analysis.

*Venable* explained that to address the problem of prosecutors introducing racial stereotypes into criminal proceedings by admitting into evidence creative content such as rap lyrics, the Legislature passed this statute. (*Venable*, *supra*, 88 Cal.App.5th at p. 454,

review granted May 17, 2023, S279081.)  Venable was convicted of gang-related first degree murder and attempted murder.  A rap video, referring to the shooting, was admitted into evidence.  (*Id*. at p. 447.)  Venable appeared in the video with other young Black men, but he said nothing.  Most of the lyrics in the video had nothing to do with the case except for one reference that could be interpreted to be to the shooting.  Nothing in the video indicated the rapper or others in the video had personal knowledge or involvement in the shooting.  Nevertheless, the prosecution placed a lot of emphasis on the video, playing it twice during their case-in-chief and a third time during closing arguments.  (*Id*. at pp. 455–456.)

The court in *Venable* described the legislative amendment as "an ameliorative benefit" to defendants of color charged with gang-related crimes.  (*Venable*, *supra*, 88 Cal.App.5th at p. 456, review granted May 17, 2023, S279081.)  The court reasoned that trials must now be conducted without evidence that introduces bias and prejudice into the proceedings.  Pursuant to recent California Supreme Court precedent developing the rule of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), the *Venable* court reasoned the Legislature intended the new provision to apply retroactively to cases that are not yet final. (*Venable*, at p. 456, review granted May 17, 2023, S279081.)

*Venable* rejected the People's argument that because the rule dealt with the introduction of evidence, it did not directly reduce punishment.  (*Venable*, *supra*, 88 Cal.App.5th at p. 456, review granted May 17, 2023, S279081, citing *People v*. *Frahs* (2020) 9 Cal.5th 618, 624–628 (*Frahs*) [applying retroactive application of new provisions giving trial courts discretion to grant pretrial diversion for defendants with mental health disorders].)  *Venable* found applicable the rationale in *People v*. *Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 303, 308 (holding Prop. 57 retroactive, which changed the law to prohibit prosecutors from filing charges directly against a minor in an adult criminal case to give juvenile courts discretion to determine whether a minor should be prosecuted as an adult) analogous to its own facts.  (*Venable*, at pp. 457–459, review

28.

granted May 17, 2023, S279081.)  The *Venable* court further noted the rap video was prejudicial because the remaining evidence of Venable's involvement in the offenses was not strong.  (*Id*. at p. 458.)

In *Ramos*, the defendants, Daniel Ramos and Elias Ramos (no relation), were found guilty of a shooting that led to first degree murder, attempted murder, gang enhancements, and firearm enhancements.  (*Ramos*, *supra*, 90 Cal.App.5th at p. 580, review granted July 12, 2023, S280073.)  The Ramoses' gang was Center Street, a criminal street gang in Oceanside with 70 members.  Posole is a rival Oceanside gang with 100 members.  Annebell F. was 15 years old, lived in the Posole neighborhood, and was not a gang member.  Her friend, Julye R., was a member of Posole.  (*Id*. p. 582.)  At 2:00 a.m., while Julye and Annebell were talking in Balderrama Park, two men wearing dark hoodies and white bandanas covering their faces came into the park, and one began shooting.  (*Id*. at pp. 582–583.)  Julye ran for his life.  Annebell tried to hide in the crawl tube of a jungle gym but died from gunshot wounds.  (*Id*. at p. 583.)

Julye refused to cooperate with investigators.  Julye was incarcerated on another matter, and so was Annebell's brother, JoJo F.  Julye and JoJo were placed in the same cell, and police recorded their conversation in which Julye told JoJo that Julye had been targeted by Daniel Ramos.  Daniel was armed with a revolver and pulled down his bandana before shooting so Julye could see his face.  Julye described Daniel as being with Elias Ramos whom Julye referred to as " 'the short fool.' "  (*Ramos*, *supra*, 90 Cal.App.5th at p. 583, review granted July 12, 2023, S280073.)

Investigators obtained Elias's cellphone.  Elias's cellphone contained searches for Annebell's Facebook account, the park where the shooting occurred, and for " 'Oceanside teen girl shot to death.' "  (*Ramos*, *supra*, 90 Cal.App.5th at pp. 583–584, review granted July 12, 2023, S280073.)  There was also a video of Elias singing a rap which led investigators to similar YouTube videos.  In general, the rap videos, which were introduced into evidence, identify Daniel and Elias as Center Street gang members

29.

who, among other things, sought to kill Posole gang rivals. (*Id*. at p. 584.) Talking later to a confidential informant, Daniel admitted he and his " 'homie' " did a " 'hot one,' " meaning a murder, at 2:00 a.m. at a park. When asked if he used a revolver or a semi-automatic, Daniel said he used a revolver. Daniel told the confidential informant that he threw his clothes out of a car. (*Id*. at p. 585.)

The rap videos on Elias's cellphone were recorded on YouTube and referred to Center Street gang culture and criminal activity. The trial court denied defense motions to exclude the videos on Evidence Code section 352 and hearsay grounds because they were admissible against Elias as a party admission, showed his gang affiliation, intent, and premeditation. One video depicted events very similar to those that happened in the charged offenses. (*Ramos*, *supra*, 90 Cal.App.5th at p. 588, review granted July 12, 2023, S280073.)

After reviewing the most recent decisions of the California Supreme Court interpreting the *Estrada* rule, the *Ramos* court found that they carried the potential of substantial reductions in punishment for the parties. (*Ramos*, *supra*, 90 Cal.App.5th at p. 594, review granted July 12, 2023, S280073.) *Ramos* stated that *Frahs* found the ameliorative nature of a diversion program places it squarely within the spirit of the *Estrada* rule. (*Ibid*.; see *Frahs*, *supra*, 9 Cal.5th at p. 631.) *Ramos* noted that no case from our Supreme Court has applied the *Estrada* holding to a statute that does not alter the punishment for an offense, make a lesser punishment possible, or change the elements of an offense or a defense. Although Evidence Code section 352.2 may benefit a defendant by operating to exclude evidence favorable to the prosecution, the statute does not create the possibility of lesser punishment or more lenient treatment. (*Ramos*, at p. 595, review granted July 12, 2023, S280073.) *Ramos* concluded that Evidence Code section 352.2 does not apply retroactively. (*Ramos*, at pp. 595–596, review granted July 12, 2023, S280073.)

*Venable* and *Ramos* reach different conclusions concerning the retroactivity of Evidence Code section 352.2. Without expressly saying so, *Venable* implies this statute should be retroactive to protect a defendant's due process right to a fair trial. *Ramos* views the statute as a procedural change without any affect on a defendant's punishment. Both cases have been granted review by our Supreme Court which will ultimately decide this issue. Because of the strong evidence in this case, however, we need not decide whether this statute applies retroactively to McElvane's case.

### Substantial Compliance with Evidence Code Section 352.2 In Limine Hearing

The trial court conducted an in limine hearing to determine the admissibility of evidence, including McElvane's rap video. Defense counsel argued in his brief that rap lyrics are protected speech according to an article by ACLU of Northern California and included an internet link to the article. Defense counsel explained that courts view rap lyrics unfairly as incriminating evidence rather than an art form. Defense counsel noted that the lyrics did not appear to specifically reflect the complaining witnesses or incidents alleged. Defense counsel acknowledged the lyrics indicated a confession to crimes of human trafficking.

Defense counsel argued that other genres of music contain similar content to hip-hop music, but those lyrics are typically not used in criminal prosecutions. An opinion in The New York Times noted that in four prosecutions where fictional writing was used that were non-rap lyrics since 1950, three cases were thrown out and the one conviction was overturned. Defense counsel observed that country music often contains lyrics about committing crimes, but those lyrics are typically by white artists and the argument is rarely, if ever, made that country songs indicate a confession to an actual crime.

Defense counsel included a link in her brief to a 2016 study by criminologists at the University of California, Irvine where two groups of people were told lyrics came from a country song and other lyrics were from rap. Participants rated whether they found the lyrics offensive and whether they thought the lyrics were fictional or based on

31.

the writer's experience. The participants in the study judged rap lyrics to be more offensive and truer to life. The study suggested that rap lyrics could inappropriately impact jurors when admitted as evidence to prove guilt.

Defense counsel also noted the New York State Senate passed a bill that would require prosecutors to make a showing the material being presented is literal rather than figurative or fictional. Acknowledging that this law was not yet signed into law and was not binding in California, defense counsel argued it is persuasive that other states are taking legal steps to stop the unfair use of rap music in jury trials. Defense counsel concluded her argument by noting rap music is predominantly produced by black men, McElvane is a black man, and the potential of racial bias from introduction of this evidence was a major risk at trial.

The prosecutor filed a motion seeking to admit the rap video into evidence. The prosecutor noted that although Evidence Code section 1101, subdivision (a) prohibits admission of character evidence to prove a defendant's conduct on a particular occasion, Evidence Code section 1101, subdivision (b) provides exceptions where the prior conduct is "relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act." The prosecutor argued that where a defendant charged with pimping and pandering sent bragging text messages about his conduct to persons unconnected to the charged offense, the messages could be introduced to show intent where there was other evidence indicative of the pimp-prostitute relationship (citing to *People v. Scally* (2015) 243 Cal.App.4th 285, 314–315). The prosecutor argued McElvane's music video was admissible to show knowledge of the human trafficking subculture and intent to traffic sex workers.

Carpenter testified at the hearing that she was an expert in human trafficking. After reviewing the return for a warrant on McElvane's Instagram account, Carpenter discovered links or photos to music videos posted on YouTube. Carpenter also received returns on search warrants for other social media accounts and found "Cashoutt Domo" on YouTube. She found the video "No Love" among other videos in McElvane's accounts. McElvane promoted his YouTube rap videos through his social media.

Although Carpenter did not know who produced the video or wrote the lyrics, she explained that rappers usually write their own lyrics. Carpenter said that when a rapper is promoting his art through his social media, he posts a link to it. In recorded jail conversations with Dixon, McElvane discussed not deleting his Instagram account because it was his music promotion account. Instead, McElvane discussed changing the name of the account. After listening to over 100 jail calls from or to McElvane, Carpenter was aware of his voice and verified that the voice and person depicted in the video was McElvane.

In her statements to the court, defense counsel distinguished *People v. Scally*, *supra*, 243 Cal.App.4th 285 because the text messages to third parties were used to rebut defendant's argument that he was only texting his girlfriend. The text messages to third parties were used to show his intent to act as a pimp and traffic pursuant to Evidence Code section 1101, subdivision (b). Defense counsel argued that until McElvane decided to testify and deny the allegations, he had not yet opened the door by denying intent to traffic. Defense counsel reiterated all of her arguments from her written brief, including that rap music is used as confession to crime more than country music sang by white artists, which is not usually taken as a literal confession.

Defense counsel added that rap and hip-hop music are traditionally produced by black artists and used in prosecutions to show confession to actual crimes and there is a major racial component to this. In addition to discussing the bill passed by the New York State Senate, defense counsel mentioned the California Racial Justice Act of 2020

33.

(§ 745). Defense counsel referred to The New York Times opinion article and the 2016 study from the University of California, Irvine indicating the substantial risk of prejudicial impact on jurors from playing rap music because they believe it to be more truthful. Defense counsel added that it was unclear McElvane produced or wrote the music or who was responsible for uploading it, leaving the evidence with a very low probative value with nothing linking it to the charged crime. Defense counsel described the video as amounting to character evidence to show McElvane was a pimp.

The prosecutor argued the video depicted McElvane bragging about being a pimp and trafficking. The prosecutor added that McElvane pled not guilty to human trafficking, he has promoted these videos, and if it is 20 years old, he was still promoting the video on his Instagram account even after his arrest. The video showed McElvane's intent and constituted admissions. McElvane expressed concern even from jail about promoting his music videos.

The trial court found that McElvane placed all the elements of the case at issue with his not guilty plea. The court thought the prosecutor made a good point about McElvane continuing to promote his social media accounts with links to his music videos. The court thought McElvane's rap video was incriminating because he was bragging about the behavior he described in the video. The court, however, did not find the video to be so prejudicial that the jury would be unable to sort through it. The court found the evidence relevant and pursuant to Evidence Code section 352, balancing the relevance against any prejudicial effect, the court thought its relevance outweighed any prejudicial effect and found the rap video admissible. The court further found the evidence admissible under Evidence Code section 1101, subdivision (b) to show McElvane's intent and that the video was not improper character evidence.

*Analysis*

We initially note that there was no error in the trial court's analysis of the admissibility of the rap video based on the law as it stood during McElvane's trial in

34.

2022, nor is such error alleged by the parties.[10]  The People argue the trial court's ruling substantially complied with Evidence Code section 352.2.  The defense presented the trial court with the key factor of the new statute—the potential to inject racial bias into the proceedings.  The new statute, however, provides for an evidentiary hearing based on credible expert testimony, which did not happen here.

Evidence Code section 352.2, subdivision (a)(1) sets forth the following specific criteria for courts to weigh in deciding the admissibility of a defendant's creative content: "[T]he probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available."  The trial court expressly considered the issue of whether the video was near in time to the alleged offenses, ultimately agreeing with the prosecutor that the video remained in continuous publication.  The court's comments also show the court found sufficient similarity to the video and the alleged crimes.  The trial court's ruling appears to clear this initial admissibility threshold.

Subdivision (a)(2) of Evidence Code section 352.2 further requires the court to weigh the following in its determination of whether there is undue prejudice:  "[U]ndue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of [Evidence Code s]ection 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings."

The trial court considered the propensity for violence or general criminal disposition in its Evidence Code sections 352 and 1101 analysis.  Defense counsel raised

---

**10**     In our view, the video in question could be found admissible under the new law if this case were to be remanded for a hearing in light of the new statute.

35.

the issue of racial bias in her written brief, making it the focus of her argument. In her oral arguments to the court, defense counsel emphasized traditional Evidence Code section 352 considerations of improper admission of character evidence. Defense counsel also emphasized all of the materials she introduced in her written brief that discussed the problem of racial bias. The prosecutor directed her oral arguments toward traditional prejudice considerations. The court focused its analysis of the admissibility of the rap video on Evidence Code sections 352 and 1101. Although the court did not expressly refer to the problem of injecting racial bias into the proceedings, this argument was before the court in McElvane's written briefing and his counsel's oral argument. The court considered whether prejudice outweighed the probative value of admitting the video within the context of the arguments of both parties.

Application of the substantial compliance doctrine to the in limine motion is complicated, however, by the more expansive evidentiary hearing envisioned by subdivision (b) of Evidence Code section 352.2. Evidence Code section 352.2, subdivision (b) expressly allows for "[c]redible testimony on the genre of creative expression as to the social or cultural context, rules, conventions, and artistic techniques of the expression" and for experimental or social science research demonstrating that introduction of such "expression explicitly or implicitly introduces racial bias into the proceedings." (Evid. Code, § 352.2, subd. (b)(1), (2).)

Defense counsel argued there was a major racial component to the introduction of rap music by black artists and referred to legislation in New York that would require a material showing by prosecutors before introducing artistic content. Counsel referred to articles in The New York Times and from ACLU of Northern California. She also referred to a 2016 study comparing rap lyrics to country lyrics. This study showed that a group of people found rap lyrics more offensive and truer to life. In her brief, defense counsel argued there was a chance of introducing racial bias into the trial. Defense

36.

counsel submitted the type of evidence described in subdivision (b) of Evidence Code section 352.2 but did not call any expert witnesses.

It would be speculative for us to surmise one way or the other as to whether the criteria set forth in subdivision (b) of Evidence Code section 352.2 would have prompted a more robust evidentiary showing by the defense, followed by a rebuttal by the prosecution. Perhaps the trial court would have excluded the rap video had it heard persuasive and relevant expert testimony that its introduction into evidence would inject racial bias into the proceedings. After hearing such testimony, the trial court could also have exercised its discretion to admit the video. We decline to speculate how a hypothetical hearing following all of the procedures set forth in Evidence Code section 352.2 may have turned out.

We are certain for the reasons set forth below, however, that any error in the admission of the rap video was harmless because there was no more potential to inject racial bias from the jury watching the video as there was from the jury listening to McElvane's calls from prison and witness testimony at trial. We therefore do not decide whether the in limine procedure employed here substantially complied with all of the requirements of the new law because this point is superseded by our prejudice analysis.

*Harmless Error Analysis*

The Respondent argues that presuming it was error to admit McElvane's rap video, any error was harmless under the state standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. Under *Watson*, the question is whether it is reasonably probable the verdict would have been more favorable to appellant absent the alleged error. (*Ibid*.) If, however, there is a constitutional dimension to McElvane not receiving a fair trial due to the admission of his video, the correct standard of measuring whether the error is harmless is determined under the federal standard of *Chapman v. California* (1967) 386 U.S. 18, 24. The federal standard requires that the party who benefitted from the

37.

alleged error must establish beyond a reasonable doubt that the constitutional error did not contribute to the verdict. (*Ibid.*)

We need not resolve the controlling standard of review. We find that under either standard, any presumed error was harmless because McElvane made several inculpatory statements directly related to the charges in this case during his jail calls. These included conversations with Dixon concerning whether the minors, especially Gloria, were talking to the authorities and whether they were likely witnesses in any legal proceeding. The jail conversations show that McElvane was still trying to make money as a sex trafficker, using Dixon, and he was still in charge of her. Also, many of the more derogatory and inflammatory statements McElvane uses in the video are the same as, or similar to, ones he used in his conversations from jail with Dixon.

Carpenter explained that McElvane referred to using different accounts than his own to make calls from jail. He told Dixon to be aware of calls from different accounts. This evasion began McElvane's pattern both of deception and inculpatory statements.

Early on, McElvane instructed Dixon to get into contact with the minors to figure out what was said. Later, Dixon told McElvane that a "homie," or friend who was charged with the same offense, explained that if the minors did not go to court, the authorities would not have evidence against McElvane. Dixon told McElvane she did not believe investigators had anyone's phone. In these conversations, it is clear McElvane and Dixon were working together to ascertain the strength of the case against him. These calls became more inculpatory in light of later conversations.

Dixon talked to McElvane about "internet bitches" who were advertising on the internet through commercial sex sites, transitioning into coming outside. Carpenter explained this referred to sex workers who are transitioning from working using the Internet to working outside on the street. Dixon described Brooke as a person walking with Dixon. McElvane told Dixon during the jail call to go to Hoover and get a room. McElvane was still acting as the controlling sex trafficker even while in jail.

38.

On July 9, McElvane told Dixon, "You're my bottom bitch, you're my top bitch." Dixon responded, "Aww, thank you daddy." Dixon told McElvane she was outside calling a lot of traffic but had not yet busted a date, but she was really trying. McElvane asked Dixon why she was talking like that. McElvane said that Dixon caring about his life did not "mean shit" and all Dixon was doing was incriminating him "every time." McElvane asked Dixon to "slap $500 on [his] books and stop fucking with [him]."

Carpenter interpreted the reference "fuck with me" to mean Dixon was still working for McElvane. The reference to "top bitch" meant Dixon was McElvane's most senior sex worker. On July 8, Dixon referred to sex worker Brooke and working around "grown bitches." Dixon talked about sending an Uber to "scoop" Brooke up, meaning pick her up. Dixon added, "[W]ith both of us that shit will add up." The implication of these comments is that Dixon was still engaged as a sex worker for McElvane and earning money for him.

McElvane was clearly worried in another call when Dixon told him L.M. was only 13 years old, and he replied, "Oh my God" and "The Fuck?" McElvane asked Dixon, "But she didn't say nothing though right?" McElvane, apparently worried and referring to Gloria, said, "[T]hen we don't know what's up with this other bitch, bruh, so you feel me?" McElvane, using a racial epithet, asked if she put others in jail before. Dixon said Gloria had not.

In a three-way conversation with Gloria, Dixon asked Gloria if she had talked to the police and if they had taken Gloria's phone. Gloria denied telling investigators anything. Speaking to Dixon, McElvane said, "She's lying bruh." Dixon complained that someone had talked because McElvane was facing a long prison sentence. Gloria said it was L.M. who talked to investigators.

In another conversation, McElvane wanted to know if the minors, referring to them as "bitches," were going to court and if Dixon had figured out if both of the minors had to go to court. Dixon asked how she could figure out "this shit" if they, apparently

referring to the minors, were not talking to Dixon or to McElvane's mother. This conversation implies that Dixon, and possibly McElvane's mother, were trying to influence the minors.

In a three-way conversation between Dixon, McElvane, and his mother, his mother stated the authorities could still charge him with one count even if the minors did not talk "just to stick him." McElvane, using Gloria's nickname, said he "highly" thought "the fucking [nickname] bitch said something." McElvane admitted that while sitting in the car he grabbed Dixon's hand and gave her "all the money and everything." McElvane reiterated he "knew that bitch was talkin." Dixon said she told Gloria McElvane better not be on paperwork or have a court date. This conversation is confessional because McElvane is admitting that during their arrest he gave all of the money to Dixon. It shows consciousness of guilt because he was obsessed with whether Gloria is talking to investigators, and it also shows that McElvane, rather than Dixon, was in control of the money for the criminal enterprise.

In another recording, McElvane told Dixon, "[A]nd another thing, ma, go ahead and deactivate uh my Facebook." She replied, "Ok." This conversation shows that McElvane was concerned about his Facebook content and it demonstrates his direction of Dixon as his primary sex worker, as well as the fact that Dixon had access to McElvane's social media accounts.

On July 10, McElvane asked Dixon if she talked to her neighbor and whether they "makin em come?" After a moment of misunderstanding, Dixon understood what McElvane meant and said they were making them "come to the to the thing." Dixon said, "She went the same day." McElvane asked if this was Court. McElvane asked, "My court date, bro." Dixon said, "She went to court … the same day as you." McElvane asked if it was S. or Gloria's nickname. Dixon said it was S. McElvane replied, "Oh my God, bruh, this shit has made my head hurt. Dog, that did almost made me pass out, bitch, my legs just went weak. The fuck?" Carpenter explained that the reference to

40.

Dixon's neighbor was to L.M. because they had lived in the same apartment complex in Fresno, and the reference to S. was to L.M.'s nickname.

Two conversations recorded on July 11 were illuminating. McElvane asked if Dixon was telling him, "[T]his bitch told on me." Dixon replied, "[S]he's gonna testify against you and she's already on paperwork and all that shit." McElvane lamented that they were going to throw the book at him. Dixon responded, "I know." Carpenter explained she understood McElvane and Dixon to be referring to Gloria. In one of his more inculpatory and confessional comments, McElvane told Dixon there was no point in going to trial and he might as well tell them he is guilty.

McElvane's inculpatory comments to Dixon continued during their July 13 conversation. Dixon began with a question about what "she" could tell on Dixon about. McElvane replied, "[T]hat basically you're my bottom bitch, you're my bottom bitch, you're basically my main chick." Dixon said they knew that already. McElvane added that Gloria could say Dixon "recruited her to come fuck with us and the whole and do this and do that, ya feel me? And then she could say she been trappin with you." McElvane told Dixon this could put her in jail on a pimping charge. Carpenter explained that "main chick" referred to being the most senior sex worker, "trapping" was sex work or prostitution, and the "she" in the conversation referred to Gloria. McElvane was admitting Dixon was his main sex worker and that she worked for him.

The jail conversations of McElvane's inculpatory statements show more than a consciousness of guilt. They demonstrate that he, and not Dixon, remained in control of the sex trafficking operation for his personal financial benefit. McElvane also directed Dixon to help in his defense, including to persuade the minors not to testify against him. In one three-way call, Dixon directly accused Gloria of cooperating with investigators, which had to be intimidating to Gloria, if not frightening.

McElvane's jail conversations used the vernacular of his trade—terms common to pimping, pandering, and sex trafficking he also used in the rap video. These included the

41.

"N" word, "bitch," "hoe," "Chasin bands," and "fuck." The theme of the rap video is McElvane's love of money. The video is an anthem, bragging about sex trafficking and being a pimp. McElvane showed no concern for the sex workers he claimed to be trafficking in his video. There is nothing in the video, however, that is any more derogatory or shocking than what McElvane said about sex workers and sex trafficking during his jail conversations.

The rap video was corroborative of social media and jail recording evidence, but not unduly cumulative.[11] The video was shown once during the prosecutor's case-in-chief and once during closing argument and was about four minutes long. Neither Investigator Carpenter nor the prosecutor belabored the content in the lyrics. Carpenter explained the video served to promote McElvane's sex trafficking operation. Carpenter's testimony about the video, and the prosecutor's arguments to the jury about it, focused on

---

[11] The trial court has a duty to exclude unduly cumulative evidence. (*People v. Booker* (2011) 51 Cal.4th 141, 194; see *People v. Williams* (2009) 170 Cal.App.4th 587, 612–613.) Where the content of evidence is neither inflammatory nor unduly prejudicial, it is admissible unless it invites a purely irrational response as to render the trial fundamentally unfair. (See *People v. Romero and Self* (2015) 62 Cal.4th 1, 45–46 [rejecting challenge to the quantity and content of victim impact statements in penalty phase of capital case].) The defendant's not guilty plea put all of the elements of the offense at issue and the defendant's mental state during the commission of the crime is relevant, the prosecutor is not relieved from proving this element. Where photographs of murders were introduced to show the defendant's intent, they were admissible despite their graphic nature. The prosecution may present a persuasive and forceful case, except as limited by Evidence Code section 352, and need not sanitize the evidence. (*Booker*, at p. 171.)

Trial courts are not required to exclude all cumulative evidence if it has substantial relevance to prove material facts that are hotly contested and central to the case. Such evidence is not " 'merely cumulative.' " (*People v. Lang* (1989) 49 Cal.3d 991, 1016, questioned on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190.) According to Carpenter, the video served as a means, along with McElvane's other social media, to promote and recruit for his sex trafficking operation. Thus, the video served a different evidentiary purpose in the prosecution's case than the telephone recordings of McElvane's jail calls. To the extent the video provided overlapping evidence with jail calls, it was corroborative rather than unfairly cumulative. The relevance of McElvane's rap video to the charged offenses appears to be more directly related to the allegations against him than the videos in either the *Venable* or *Ramos* cases.

42.

a few key phrases used by McElvane that indicated he was a pimp who wanted to be paid by the people he employed as sex traffickers. Nothing in the video was any more provocative or likely to inject racial bias implicitly or explicitly into the proceedings than McElvane's recorded statements during his jail conversations.

We conclude the evidence against McElvane, especially his inculpatory and confessionary statements during calls from jail, was strong enough that we are certain any error in the admission of his rap video—assuming arguendo that Evidence Code section 352.2 is held to be retroactive—is harmless beyond a reasonable doubt pursuant to the federal *Chapman* standard of review. Any such error would also be harmless under the state *Watson* standard of review. We therefore reject McElvane's contention that his case should be reversed for a new trial because his rap video was introduced into evidence.

## AMENDMENT OF INFORMATION DURING TRIAL

*Introduction*

McElvane contends the trial court erred in granting the prosecution's motion to amend both counts of the information to include the time frame in late June when they were in Los Angeles. McElvane argues his conviction on count 2 must be reversed because inclusion of the expanded time frame and location of the offenses to establish the elements of the offense violated his constitutional rights to notice and due process, depriving him of a fair opportunity to prepare his defense. McElvane asserts the prosecution ambushed him at the end of trial because his defense focused on events in Merced County rather than events that occurred in Los Angeles or Fresno.

The People respond that the prosecutor had already presented evidence of events in Los Angeles during the preliminary hearing, and events before McElvane's arrest on July 3 were relevant to the charge all along. We agree with the People that the amendment did not constitute error.

43.

### *Preliminary Hearing and Motion to Amend at Trial*

The original information charged McElvane with trafficking Gloria and L.M. on or about July 3. During the preliminary hearing, Gloria testified that she went to Los Angeles in June and the vehicle she was riding in was pulled over on July 3. Gloria began communicating with Dixon about going down to Los Angeles. Gloria confirmed that she went to Los Angeles to work as a prostitute and to pay McElvane. McElvane and Dixon got Gloria a train ticket from Fresno to Los Angeles.

Gloria went to Los Angeles with the clothes she was wearing and a fanny pack. An Uber or Lyft brought Gloria to a hotel on Figueroa where she met McElvane and Dixon. Gloria entered a gray Kia with McElvane, Dixon, and L.M. They went to Figueroa and 70th Streets where Gloria was to work as a prostitute. McElvane told Gloria to send him an emoji sign when she caught a date with a John with whom she was expected to have sex in exchange for money. Gloria could not remember how many dates she had, but she performed intercourse and oral sex in exchange for money. She gave McElvane all of the money she made.

L.M. was outside talking to Johns. Gloria saw L.M. leave with a John. Gloria worked all day and all night every day. Gloria was not sure of the exact length of time she was in Los Angeles but thought it was about eight days. Gloria sometimes gave the money she made to Dixon and other times to McElvane. In Los Angeles, Gloria became scared and contacted her sister who sent her a number to contact for help.

After their time in Los Angeles, they all went to Fresno. Gloria called her mother to get her but ran out of time. Gloria asked McElvane if she could get her clothes. He called her a bitch and told her she should have told him earlier. McElvane threatened to "fire" Gloria and leave her on the freeway. Gloria texted "911" because she just wanted to go home. On July 3, Talbot followed their car in Merced County but stopped it in Stanislaus County.

The parties' arguments and the court's findings during the preliminary hearing centered on whether Merced County or Los Angeles County was the proper jurisdiction to bring this case. The parties stipulated that the trial court could make factual findings regarding jurisdiction and continued the hearing so the court could deliberate.

The trial court later found Gloria was lured to Los Angeles County by defendants McElvane and Dixon for the purposes of prostitution and gave all the money she received for those acts to the defendants, but primarily to McElvane. The trial court found Gloria testified she was in Los Angeles for eight days before leaving with the defendants to go to Oakland. After briefly stopping in Fresno County, the group, which included the defendants and L.M., drove through Merced County. McElvane became angry with Gloria and threatened to fire her on the freeway. The court found the charged offenses occurred in Merced County and the events in Los Angeles were not part of these allegations but were admissible to prove the elements of section 236.1, subdivision (c)(2). The court ruled Merced County had jurisdiction to try the case and held both defendants over to answer on both counts.

The prosecutor moved during her case-in-chief at trial to amend the information on both counts by interlineation so that the dates alleged were June 26 to July 3 instead of a reference only to July 3. Defense counsel objected on due process grounds, arguing the alleged conduct was limited to what occurred on Highway 99. The trial court noted the events leading up to July 3 were admissible to show a course of conduct. The court referred to its earlier decision after the preliminary hearing that events in Los Angeles were relevant to show McElvane had threatened Gloria to continue working for him.

After initially reserving its ruling, the trial court reread the preliminary hearing transcript where the original objection by the defense concerned jurisdiction. The court found that all along the parties were aware the events in Los Angeles were relevant to the allegations against McElvane. The court noted the continuing nature of the offense, which even at the preliminary hearing included a range of acts that began in Los Angeles

45.

County, giving the defense notice of the People's theory of the case. The court found there was not a due process violation and granted the motion to amend both counts by interlineation.

*Amending Information and Due Process*

The preeminent due process principle is that one accused of a crime must be informed of the cause and nature of the accusation. (*People v. Jones* (1990) 51 Cal.3d 294, 317.) Criminal defendants have a due process right to be advised of pending charges so he or she has a reasonable opportunity to prepare and present a defense and not be taken by surprise by the evidence proffered at trial. (*Ibid.*) The right to defend includes the right to notice of the charges and the right to present a defense to those allegations. (*Ibid.*) In modern criminal prosecutions, it is clear they are initiated by the information and the transcript of the preliminary hearing. (*Ibid.*)

The information performs the limited role of informing the defendant of the kinds and number of offenses. The preliminary hearing transcript provides the time, place, and circumstances of the charged offenses, representing the so called " 'touchstone of due process notice to a defendant.' " (*People v. Jones*, *supra*, 51 Cal.3d at p. 312.) The transcript of the preliminary hearing, not the accusatory pleading, affords the defendant practical notice of the criminal acts against which he or she must defend. (*Id.* at pp. 312, 317.)

The court may allow amendment of the accusatory pleading to correct or make the factual allegations more specific to the charged offense "at any stage of the proceedings," up to and including the close of trial, if there would be no prejudice to the defendant. (§ 1009.) Section 1009 provides that an indictment or information cannot amend the offense charged so as to allege an offense not shown by the evidence produced at the preliminary hearing. (§ 1009; *People v. Graff* (2009) 170 Cal.App.4th 345, 361–362; *People v. Winters* (1990) 221 Cal.App.3d 997, 1003.)

The amendment challenged here did not allege a new or additional offense. McElvane argues that the trial court's preliminary hearing ruling threw him off because the court found the events alleged happened in Merced County, establishing jurisdiction there. The court's factual findings and ruling, however, were limited to the issue of jurisdiction and in no way placed a limitation on the prosecution from amending the information to conform with proof. McElvane and his counsel were present during Gloria's testimony and were well aware that she testified to acts of prostitution in Los Angeles. In its preliminary hearing ruling, the trial court acknowledged acts of prostitution occurring in Los Angeles but focused on whether there was sex trafficking in Merced County.

The June dates in question were known at the time of the preliminary hearing. Gloria testified that she secured a train ticket from McElvane and Dixon and traveled to Los Angeles to be employed as one of his sex workers.[12] Gloria did not remember exact dates but in her preliminary hearing testimony thought she was in Los Angeles about eight days before the group traveled north to Fresno before being stopped in Stanislaus County on July 3.

At the preliminary hearing, Gloria said she performed sex acts for money and gave the funds she made to Dixon and to McElvane. In addition to collecting money from Gloria, McElvane asked her to send him an emoji when she secured a date with a John. Gloria also saw L.M. on the street making dates with Johns. This was evidence

---

[12]    Social media evidence of McElvane and Dixon contacting Gloria on June 23 and 28 was introduced at trial. The ticket was introduced into evidence as exhibit 120 and was dated June 28. Videos and photographs with time stamps in June depicted Gloria with L.M., with McElvane walking in the background of one of them. Some of these were clearly taken in Los Angeles. These exhibits were presumably available to the defense team prior to the beginning of testimony. Although not presented at the preliminary hearing, this additional evidence corroborated Gloria's preliminary hearing testimony that she arrived in Los Angeles to engage in sex work toward the end of June and gave further notice to the defense that sex trafficking occurred in June as well as on July 3.

McElvane was in charge of a sex trafficking operation in Los Angeles during at least the last five days of June, and that he was trafficking Gloria and L.M.

The information is controlling on the specific facts and nature of the charges against the defendant. McElvane was well aware of the more specific details of the charges against him as a result of the preliminary hearing, which included the testimony of Gloria, Investigator Carpenter, and Officer Talbot. There was no surprise to the defense or added allegation. The defendant had ample notice to prepare a defense that included evidence during the preliminary hearing of his presence and sex trafficking in Los Angeles. The nature of the offense here was ongoing, occurring over more than a week.[13]

McElvane was not deprived of due process or an opportunity to defend against the allegations when the trial court granted the prosecution's motion to amend the dates of the charges in the information. We reject McElvane's contention that he was denied a fair trial by the amendment of the information.

### DISPOSITION

The judgment is affirmed.

HILL, P. J.

WE CONCUR:


PEÑA, J.


SMITH, J.

---

**13**     Pimping and pandering have been held to be crimes of a continuous and ongoing nature. (*People v. Leonard* (2014) 228 Cal.App.4th 465, 489.) Sex trafficking under section 236.1, subdivision (c) also appears to be a continuous and ongoing crime as the circumstances of the minors' travels across California with McElvane and Dixon illustrate.

**APPENDIX**

**"YOUTUBE CASHOUTT DOMO**
**" 'No Love' Lyrics**

"And another one, and another one, [C]ashoutt [D]omo [D]omo
"Bitch bitch bitch
"And another one, and another one, and another one, and another one

"(female voice) (unintelligible) hit that shit

"Dumb Thot man you gets no love
"Stupid Bitch man you gets no love
"Chasin bands only thing that I love
"Chasin bands only thing that I love
"Dumb Thot man you gets no love
"Stupid Bitch man you gets no love
"Chasin bands only thing that I love
"Chasin bands only thing that I love

"Cashoutt Domo

"Comin up I had to get it out the (unintelligible)
"F[*]g[**]t Bitch say she wanna choose up
"Tell that bitch I need blue strips huh
"N[****]s (unintelligible) give two fucks huh
"I'm getting money out that bitch man (unintelligible)
"Bitch keep lookin at a n[***]a I need a fee
"I gotta keep it on her bruh I can't trust these snitches
"N[****]s hate'n on me bruh what the fuck you mean
"I'm getting money out this bitch bruh she steady hoe'n
"And all my bitches straight goer's but they straight hoe'n
"And all my bitches straight goer's but they straight hoe'n
"And all my bitches straight goer's but they straight hoe'n

"Dumb Thot man you gets no love
"Stupid Bitch man you gets no love
"Chasin bands only thing that I love
"Chasin bands only thing that I love
"Dumb Thot man you gets no love
"Stupid Bitch man you gets no love
"Chasin bands only thing that I love
"Chasin bands only thing that I love

49.

"I'm getting bands n[****]s hate'n on me
"I'm getting money n[****]s hate'n on me
"It's another one, why you playin homie
"It's another one of you bitches that be bustin dates fo me
"I'm getting money n[****]s hate'n on me
"I'm getting money n[****]s hate'n on me
"Don't fuck with n[****]s, n[****]s plottin on me
"Can't fuck with n[****]s, n[****]s plottin on me

"Stupid bitch wanna choose up, I need a fee
"Stupid bitch wanna fuck with me, I need a fee
"These union dues cost money bitch, I need a fee
"[You're] talkin to a real "P" bitch, I need a fee
"I'm real bad at this shit, I been getting nasty
"Girl bad at this shit, I been a touch of nasty
"You think it's playin, on my mama oh I understand
"N[****]s playin, on my mama oh I understand

"Dumb Thot man you gets no love
"Stupid Bitch man you gets no love
"Chasin bands only thing that I love
"Chasin bands only thing that I love
"Dumb Thot man you gets no love
"Stupid Bitch man you gets no love
"Chasin bands only thing that I love
"Chasin bands only thing that I love

"Cashoutt Domo, Domo Cashoutt, Cashoutt fucking Domo whatever the fuck you wanna call it I'm back at it again
"(unintellible) fuckin with me
"Cashoutt Domo, Cashout Domo, Cashoutt fucking Domo, whatever the fuck you wanna call it I'm back at in again
"Chasin bands only thing that I love
"Chasin bands only thing that I love
"What you say bitch (unintelligible)
"Oh oh oh …"